**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL URBAN LEAGUE,
117 W 125th Street, 3rd Floor
New York, NY 10027,

HOUSING ACTION ILLINOIS,
67 E. Madison Street, Suite 1603
Chicago, IL 60603,

NORTH CAROLINA HOUSING COALITION,
3608 University Dr., Suite 201
Durham, NC 27707,

NEW JERSEY CITIZEN ACTION,
625 Broad Street, Suite 270
Newark, NJ 07102,

HOUSING & COMMUNITY DEVELOPMENT NETWORK OF NJ,
145 W. Hanover St.
Trenton, NJ 08618,

NATIONAL COALITION FOR ASIAN PACIFIC AMERICAN COMMUNITY DEVELOPMENT,
1025 Connecticut Avenue NW, Suite 1017
Washington DC 20036,

FAIR HOUSING RESOURCE CENTER,
1100 Mentor Avenue
Painesville, Ohio 44077,

SOUTHWEST FRESNO COMMUNITY DEVELOPMENT CORPORATION
1424 West California Ave.,
Fresno, CA 93706

SOMERVILLE COMMUNITY CORPORATION
337 Somerville Avenue, Second Floor
Somerville, MA 02143

*and*

CONSUMER CREDIT & BUDGET

Civil Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COUNSELING, INC., d/b/a NATIONAL
FOUNDATION FOR DEBT MANAGEMENT,
13921 Icot Boulevard, Suite 706
Clearwater, FL 33760,

*Plaintiffs*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*,
1600 Pennsylvania Ave NW
Washington, DC 20500,

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
451 7th Street SW
Washington, DC 20410,

ERIC SCOTT TURNER, *in his official capacity as Secretary of the U.S. Department of Housing and Urban Development*,
451 7th Street SW
Washington, DC 20410,

CRAIG TRAINOR, *in his official capacity as Assistant Secretary for the Office of Fair Housing and Equal Opportunity*,
451 7th Street SW
Washington, DC 20410,

OFFICE OF MANAGEMENT AND BUDGET,
725 17th St NW
Washington, DC 20503,

RUSSELL VOUGHT, *in his official capacity as Director of the Office of Management and Budget*,
725 17th St NW
Washington, DC 20503,

*and*

UNITED STATES,

*Defendants*.

## INTRODUCTION

1. This action challenges the Trump Administration's effort to punish grantees for their past speech and viewpoint on topics that have nothing to do with grant activities by unilaterally cancelling congressionally mandated funding for a federal housing counseling program—using a so-called "pocket rescission."

2. On September 25, 2026, just *five days* before the statutory deadline to obligate the funds, President Trump signed and the Office of Management and Budget (OMB) transmitted to Congress a package of proposed rescissions of almost $1 billion in congressional appropriations. Although the rescission package was ostensibly a "proposal" to Congress to rescind the funds pursuant to the Impoundment Control Act (ICA), the Administration never intended to wait for Congress to enact the proposal. Instead, the Administration declared that the money was automatically rescinded by the mere act of sending the proposal to Congress, a ludicrous theory based upon a faulty interpretation of the ICA, ironically a law that Congress enacted to *prevent* impoundments.

3. One of the proposed rescissions is for $56.1 million of the $57.5 million appropriated by Congress for the Department of Housing and Urban Development's (HUD's) Comprehensive Housing Counseling (CHC) program, which Congress created nearly 60 years ago to provide information, advice, and tools for consumers seeking, financing, maintaining, renting, or owning a home, and to assist homeowners facing foreclosure or homelessness. Those CHC funds were expected to be awarded to approximately 175 Housing Counseling Agencies (HCAs), Intermediary & State Housing Finance organizations, and training partners across the country. U.S. Dep't of Hous. & Urb. Dev., *Comprehensive Housing Counseling (CHC) and Housing Counseling Training (HCT) Notice of Funding Opportunity (FY 2025)*, FR-6900-N-33, at 8 (Mar. 26, 2026) ("FY 2025 NOFO").

4. There can be no doubt that the Administration's decision to rescind the CHC program funding, thereby denying grant applicants access to a public benefit, was based upon its deep animus for the grant applicants' particular viewpoint. Defendants declared as much in their official public statements in which they justified the proposed rescission by stating that CHC grantees are "NGOs with divisive and DEI-centric agendas that peddle discrimination based on race." *President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending*, The White House (Sept. 25, 2026).[1]

5. On that same day, the OMB stated on the official White House website that it is rescinding "HUD Counseling Support for NGOs that Peddle DEI and Discriminate Based on Race ($56 million)," claiming that the program "focuses on grantees with DEI-centric discriminatory agendas," who are "radical groups." *Id.*[2] OMB then gave three examples of these "radical groups," two of which were Plaintiffs National Urban League and Housing Action Illinois. *Id.* For all three examples, OMB described the organization as a "left" or "far-left" NGO, and called out specific speech and viewpoints of each organization that the Administration disfavors. *Id.* For National Urban League, the disfavored speech included "call[ing] for the defunding of DHS and ICE under the Trump Administration, condemn[ing] President Trump for bringing Venezuelan dictator Nicolas Maduro to justice, and advocat[ing] for healthcare for illegal immigrants." *Id.* For Plaintiff Housing Action Illinois, its disfavored ideology was its "radical" belief that "housing is a human right," and its commitment to "advancing equitable community development and affirmatively furthering racial justice." *Id.*

---

[1] Available at, https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending/.
[2] Office of Management and Budget (@WHOMB), X (Sept. 25, 2026 at 5:29 PM ET), https://x.com/WHOMB/status/2103612846638616982.

6. Thus, the Administration has clearly stated it is denying the grantees access to public funds, via the rescission of the funds Congress appropriated for the housing counseling program, because it disfavors their protected speech and perceived ideologies. This is clearly unlawful viewpoint discrimination and it is in violation of the First Amendment.

7. The proposed rescission also unlawfully and unconstitutionally violates the relevant appropriations act, which mandates that HUD spend these funds, violates the housing counseling program's authorizing statute which mandates that HUD provide financial assistance to grantees and implement the CHC program, and usurps Congress's exclusive power of the purse in violation of the separation of powers.

8. In enacting the relevant appropriations for the CHC program in 2025, Congress mandated that HUD obligate the full amount appropriated, $57.5 million, by September 30, 2026. HUD must comply with that statutory mandate unless and until Congress enacts a new law rescinding the funds or otherwise relieving HUD of its statutory mandate. The Administration's contrary "pocket rescission" theory, under which the ICA ostensibly allows the President to unilaterally rescind funds merely by sending a proposal to Congress less than 45 days before the funds expire, is absurd as a matter of statutory interpretation.

9. The Administration made the decision to wait until five days before the funds expire to send the rescission proposal to Congress, knowing the House was not in session and even if it were, knowing it would be practically impossible for Congress to enact the proposal in such a short period of time. And under the Administration's novel ICA theory, it could have waited even longer to transmit the rescission proposal—waiting even until one minute before the funds expire—and the funds would be deemed rescinded because the President proposed them for rescission. This interpretation of the ICA deprives the statute of all practical effect. Congress obviously did not

enact a statute that operates in this manner.

10. Nor could it have. The Administration's reading of the ICA would render it a near-replicate of the Line-Item Veto Act, which the Supreme Court held unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998). Just like with the Line-Item Veto Act, Congress did not and could not have enacted the ICA to permit the President "to enact, to amend, or to repeal statutes." *Id.* at 438.

11. The unconstitutional "pocket rescission" is unsurprising as it is just the latest unconstitutional and illegal action by HUD in connection with its long running campaign against the FY2025 CHC program. HUD Defendants have done all they could to discourage Plaintiff organizations and others like them from continued participation in the program, including improperly delaying the issuance of the FY 2025 Notice of Funding Opportunity (NOFO) by five months, all while agencies continued to incur costs and provide services required by the program. And, when HUD finally issued the NOFO, it imposed new funding restrictions and unlawful post-award conditions, unrelated to and inconsistent with the governing statutory and regulatory framework. Finally, HUD dragged its feet on announcing the awards, failing to make available and disburse the congressionally appropriated program funds by its stated deadline of August 2026.

12. Defendants' unlawful actions have caused grievous economic harm to Plaintiffs and other HUD-approved intermediaries and housing counseling agencies, disrupting budgeting, staffing, and service delivery; forcing organizations to draw down reserves and reduce services; and causing some organizations to lay off personnel or withdraw from the housing counseling program altogether. The September 25 rescission further jeopardizes Plaintiffs' ability to provide required housing counseling services to prospective and current homeowners, tenants, and families

facing housing instability.

13. Plaintiffs therefore challenge Defendants' unlawful pocket rescission of $56.1 million in congressionally appropriated funds for the FY 2025 Comprehensive Housing Counseling program under the First Amendment and the Administrative Procedure Act, as well as the applicable appropriations laws. Plaintiffs seek declaratory and injunctive relief, vacatur of the unlawful rescission, an order requiring Defendants to administer the CHC program in accordance with law, vacatur of unlawful funding restrictions and post-award conditions, and relief prohibiting Defendants from withholding or terminating appropriated funds based on Plaintiffs' protected speech, advocacy, association, or viewpoint.

## JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and laws of the United States, including the APA, 5 U.S.C. §§ 701–706, 12 U.S.C. § 1701x, and the federal regulations governing HUD's Housing Counseling Program, and 28 U.S.C. § 1343 (action to redress deprivation of rights secured by the Constitution of the United States).

15. The Court has authority to enter a declaratory judgment and to provide preliminary and/or permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers. The APA further authorizes the Court to stay, set aside, enjoin, or vacate agency action that is without observance of procedure required by law; arbitrary, capricious, or contrary to constitutional right; or is otherwise not in accordance with law. 5. U.S.C. §§ 705-06.

16. Venue is proper in this District under 28 U.S.C. § 1391 (b)(2) and (e)(1) because Defendants are agencies or officers of the United States and a substantial part of the events or omissions giving rise to this action occurred in this District.

17. The APA waives sovereign immunity for actions seeking relief other than money damages against federal agencies and officers. 5 U.S.C. § 702.

18. HUD's issuance and implementation of the challenged NOFO constitute final agency action within the meaning of 5 U.S.C. § 704, or, alternatively, constitute agency action unlawfully withheld or unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

## PARTIES

19. **Plaintiff National Urban League ("Urban League")** is a 501(c)(3) nonprofit civil-rights organization with over 90 affiliates serving 300 communities in 37 states and the District of Columbia. Founded in 1910, the National Urban League is headquartered in New York City. Committed to principles of diversity, equity, inclusion, and accessibility, Urban League promotes economic empowerment through programming and advocacy around education and youth development, job training and workforce development, housing counseling, entrepreneurship, health, and overall quality of life. Urban League has been a certified HUD Housing Counseling National Intermediary agency since 1997, providing various types of housing counseling and education services to individuals on a one-on-one basis, including the critically important face-to-face counseling under its National Foreclosure Mitigation Housing program. In FY 2023, Urban League received $1.6 million in HUD funding to support its housing counseling program. The White House specifically identified Urban League and this $1.6 million award in its September 25th announcement of the HUD funding subject to rescission. Urban League applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding for Urban League's housing counseling programs and impairs its ability to distribute future funds.

20. **Plaintiff Housing Action Illinois ("HAI")** is a 501(c)(3) nonprofit based in Chicago, Illinois, whose mission is to expand and preserve quality, affordable housing for low-

and moderate-income Illinoisans. HAI is a statewide coalition of more than 200 member organizations. Since 2014, HAI has served as a HUD-approved Housing Counseling Intermediary, securing HUD funding and distributing it through a network of HUD-approved housing counseling agencies that is now being targeted by the rescission. HAI's intermediary network has grown from 12 subgrantees in 2014 to 38, while its HUD counseling awards grew from an initial $307,000 to more than $1 million. In 2022, HAI educated 609 participants through 26 trainings and received nearly $1.4 million from HUD to distribute to housing counseling agencies and continue its training program. For FY 2023, HAI was awarded $1.5 million in HUD housing counseling funds identified in the White House's September 25, 2026 rescission announcement. HAI competes for CHC funding annually through HUD's Office of Counseling's NOFO process. For FY 2025, HAI invested more than 300 hours of staff time preparing its application, including reviewing proposed work plans with its subgrantees and completing required charts, narratives, and certifications. If given the opportunity, HAI would compete for and seek to receive future CHC awards. The rescission eliminates funding for HAI's housing counseling programs and impairs its ability to distribute future funds.

21. **Plaintiff North Carolina Housing Coalition ("NCHC")** is a 501(c)(3) nonprofit based in Durham, North Carolina. NCHC's mission is to lead a movement to ensure that every North Carolinian has a home in which to live with dignity and opportunity. NCHC meets its mission by convening, resourcing, and mobilizing affordable housing professionals, communities impacted by a lack of affordability, and the broader public to pursue policies at the local, state, and federal levels that improve the supply, quality, and access of affordable housing in North Carolina. NCHC applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates

funding for NCHC's housing counseling programs and impairs its ability to distribute future funds. The rescission eliminates funding for NCHC's housing counseling programs and impairs its ability to distribute future funds.

22. **Plaintiff Housing & Community Development Network of NJ ("HCDNNJ" or "The Network")**, a 501(c)(3) nonprofit based in Trenton, New Jersey, is a statewide association of over 250 nonprofit housing and community development corporations, individuals, and professional organizations dedicated to expanding economic opportunities for low-and moderate-income community residents across the state. Since 1989, HCDNNJ has worked to strengthen community development corporations and support neighborhood revitalization efforts throughout the state. Since 2014, HCDNNJ has served as a HUD-approved Housing Counseling Intermediary, providing funding administration, training, and compliance oversight to a network of nine local HUD-approved housing counseling agencies serving most of New Jersey's 21 counties. HCDNNJ and its subgrantees have received HUD Housing Counseling funds continuously since 2014, with HCDNNJ's FY 2024–25 award totaling approximately $333,000. HCDNNJ applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding on which HCDNNJ and its subgrantees rely to provide housing counseling services to New Jersey residents.

23. **Plaintiff New Jersey Citizen Action ("NJCA")** is a 501(c)(3) nonprofit based in Newark, New Jersey. NJCA is dedicated to advancing economic, racial, and social justice and protecting the rights and interests of New Jersey residents, particularly in low- and moderate-income communities. NJCA launched its housing counseling program in 1993 and received HUD certification in 1995, and since then has provided free HUD-certified housing, rental, foreclosure, financial, and homeownership counseling throughout all 21 New Jersey counties. NJCA has

received HUD CHC funding for nearly 30 years, including as a direct HUD applicant for nearly 20 years and, for the past 12 years, as a subgrantee of the Housing and Community Development Network of New Jersey. Approximately nine percent of NJCA's organizational budget is supported by HUD CHC funding. NJCA applied for FY 2025 HUD CHC funding as a subgrantee through the Network and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding NJCA relies on to sustain its housing counseling program and will require it to reduce or reallocate housing counseling capacity.

24. **Plaintiff National Coalition for Asian Pacific American Community Development ("National CAPACD")** is a 501(c)(3) nonprofit organization dedicated to advancing community development and advocating against gentrification and displacement of Asian American, Native Hawaiian, and Pacific Islander communities. National CAPACD represents and supports more than 150 community-based organizations in driving their local strategies. National CAPACD backs their efforts by advancing progressive national policies. National CAPACD applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding National CAPACD relies on to sustain its housing counseling program and will require it to reduce or reallocate housing counseling capacity.

25. **Plaintiff Fair Housing Resource Center ("FHRC")** is a 501(c)(3) nonprofit, direct-service fair housing and housing services organization based in Painesville, Ohio. FHRC is a Qualified Fair Housing Organization and has been a HUD-approved Housing Counseling Agency since 2003. For 23 years, FHRC has received HUD Housing Counseling grant funding to support counseling and education services for low- and moderate-income households and other residents seeking to obtain or maintain stable housing. In FY 2024, FHRC was awarded $55,000

for HUD CHC programming. FHRC applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. As a result of not receiving FY 2025 HUD funding, FHRC discontinued most of its housing counseling programs in spring 2026. The rescission eliminates funding for FHRC's housing counseling programs to Ohio residents and impairs its ability to distribute future funds.

26. **Plaintiff Southwest Fresno Community Development Corporation ("SWFCDC")** is a 501(c)(3) community-based nonprofit organization dedicated to lifting up and restoring pride in Southwest Fresno by expanding affordable housing, pathways to homeownership, and community wealth. Founded in 2012, SWFCDC works to address longstanding poverty, disinvestment, unemployment, and housing instability in Southwest Fresno. SWFCDC is a HUD-certified housing counseling agency that provides multilingual homebuyer education, individualized housing counseling, credit and financial coaching, and assistance accessing down-payment resources for low- and moderate-income residents. Its housing counseling and education programs are designed to help residents overcome barriers to homeownership and build generational wealth, including through post-purchase support. SWFCDC applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding that SWFCDC relies on to support its housing counseling programs and limits its ability to administer future HUD housing counseling funds.

27. **Plaintiff Somerville Community Corporation ("SCC")** is a 501(c)(3) community-based nonprofit organization in Somerville, Massachusetts dedicated to sustaining a diverse and affordable community through affordable housing, economic opportunity, and community empowerment. SCC develops and preserves affordable rental and homeownership

opportunities and provides programs designed to promote financial stability, economic mobility, and affordable homeownership. SCC provides HUD-recognized first-time homebuyer education and counseling, including individualized counseling and programs addressing homeownership opportunities for low- and moderate-income residents. SCC's housing counseling services are part of its broader efforts to expand equitable access to safe and affordable housing and help residents achieve sustainable homeownership. SCC applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding that SCC relies on to support its housing counseling programs and limits its ability to administer future HUD housing counseling funds.

28. **Plaintiff Consumer Credit & Budget Counseling, Inc, d/b/a National Foundation for Debt Management ("NFDM")** is a 501(c)(3) non-profit educational organization based in Marmora, New Jersey with an additional office in Clearwater, Florida. NFDM is a HUD-approved housing counseling intermediary dedicated to advancing housing stability, sustainable homeownership, and financial capability. Through its network of HUD-approved housing counseling agencies and direct housing counseling operations, NFDM provides funding administration, training, technical assistance, and housing counseling services to low- and moderate-income households and other underserved populations nationwide. NFDM has a longstanding history of receiving and administering HUD Housing Counseling funds, having received 16 HUD grant awards across 15 fiscal years from FY 2007 through FY 2024, totaling more than $2 million. NFDM applied for FY 2025 HUD Comprehensive Housing Counseling funding and, if given the opportunity, would compete for and seek to receive future CHC awards. The rescission eliminates funding that NFDM relies on to support its housing counseling programs and limits its ability to administer future HUD housing counseling funds.

29. **Defendant Donald J. Trump** is the President of the United States. He is sued in his official capacity.

30. **Defendant HUD** is an executive branch department of the United States government. 42 U.S.C. § 3532(a). HUD administers a variety of federal housing programs and grants, including the FHAP. HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). Congress has directed HUD to administer the CHC program.

31. **Defendant Eric Scott Turner** is the Secretary of HUD, the highest-ranking official in HUD, and responsible for the decisions of HUD and for the administrating of the CHC program. He is sued in his official capacity.

32. **Defendant Craig Trainor** is the Assistant Secretary for FHEO. He administers HUD's programs that enforce the FHA and other federal civil rights laws, including the FHAP. He is sued in his official capacity.

33. **Defendant Office of Management and Budget** (OMB) is a federal agency headquartered in Washington, D.C.

34. **Defendant Russell Vought** is the Director of OMB. He is sued in his official capacity.

35. **Defendant the United States of America** is responsible for the exercise of executive actions by the other named Defendants and all other agencies that are directed to take action with respect to the failure to release HUD funding. The United States of America is included as a defendant under 5 U.S.C. § 702.

## STATUTORY AND REGULATORY BACKGROUND

### I. HUD's Comprehensive Housing Counseling Program

36. HUD was established in 1965 during the administration of President Lyndon B. Johnson. Congress created HUD as a Cabinet-level department to coordinate the federal

government's efforts to address the Nation's housing and urban-development needs, including substandard and deteriorating housing and related urban problems.

37. Congress established HUD's Comprehensive Housing Counseling program in 1968 through the Housing and Urban Development Act of 1968. Section 106 of that Act, codified at 12 U.S.C. § 1701x, authorizes the Secretary to provide, and to make grants to or contract with public or private organizations to provide, information, advice, and technical assistance including counseling and advice to tenants and homeowners concerning property maintenance, financial management, and other matters appropriate to assist them in improving their housing conditions and meeting the responsibilities of tenancy or homeownership. 12 U.S.C. § 1701x(a)(1)(iii).

38. The statute provides that the "Secretary *shall* make financial assistance available . . . to HUD-approved housing counseling agencies and State housing finance agencies." *Id.* § 1701x(a)(4) (emphasis added).

39. The statute further provides that "[t]he Secretary shall issue any regulations that are necessary to carry out" the CHC program. *Id.* § 1701x(c)(7).

40. For decades, the CHC program has provided funding, training, and technical support to a nationwide network of HUD-approved housing counseling intermediaries and agencies ("HCAs"). The Program supports more than 2,200 HCAs and more than 6,700 housing counselors, who collectively assist nearly 2 million households annually. U.S. Dep't of Hous. & Urb. Dev., *Housing Counseling Intermediary Toolkit: Orientation* (Feb. 2016).[3]

41. HUD-approved HCAs provide education and counseling services concerning a wide variety of housing-related issues. Depending on the agency and the client's needs, these

[3] Office of Housing Counseling, HUD Intermediary Toolkit: Orientation, https://files.hudexchange.info/resources/documents/Housing-Counseling-Oversight-Agency-Toolkit-Orientation.pdf (last visited Sept. 29, 2026).

services include budget and credit-management counseling, pre-purchase counseling, post-purchase counseling, mortgage-default and foreclosure-intervention counseling, reverse-mortgage counseling, rental counseling, and homelessness counseling. HUD-approved agencies also provide education, referrals, and follow-up services intended to ensure that clients receive comprehensive housing information and counseling.

42. Housing counselors assist consumers with the financial and practical aspects of obtaining and maintaining housing. Counselors teach basic principles of money management, assist consumers in increasing income and savings, improving housing conditions, and achieving greater housing stability and confidence. Counselors also educate consumers concerning the rights and responsibilities associated with homeownership and rental tenancy.

43. The HUD Intermediary Toolkit describes housing counselors as serving households confronting unemployment, inappropriate mortgage products, high debt, and other financial difficulties affecting their housing stability. *Id.* at 7. Counselors may also assist households in finding and maintaining housing after military deployment or when families must relocate because their existing housing situation is unsustainable.

44. The Housing Counseling Program addresses both immediate housing crises and longer-term housing and financial goals. HUD identifies homelessness and foreclosure intervention, first-time home purchase, financial planning, and matched-savings programs among the circumstances in which housing counseling may assist households.

45. Housing counselors also serve as a gateway to other sources of assistance. Housing counselors connect households with state, local, federal, and private housing-assistance programs and provide an important safeguard against scams and fraud. The Program therefore operates not

only as a source of direct counseling but also as an entry point through which households may access other housing resources.

46. The CHC program reaches households throughout the United States, including underserved individuals and families. HUD reported that, in 2014, 50 percent of counseled clients were racial minorities, and 85 percent had low- or moderate-incomes. *Id.* HUD also reported that housing counseling was provided in 22 different languages nationwide through in-person, telephone, and Internet modalities. *Id.*

47. HUD has described the Program as supporting state, local, and federal housing priorities and Fair Housing efforts. *Id*. Housing counseling also supports the effectiveness of other HUD initiatives by connecting households with information and assistance relevant to their housing and financial circumstances.

48. HUD has further recognized evidence that housing counseling can improve outcomes for prospective and existing homeowners, including households experiencing financial difficulties. *Id.* Pre-purchase counseling has been associated with reductions in mortgage delinquency and has been shown to reduce delinquency rates by approximately 19 to 50 percent. *Id.* at 8. Reports show that homeowners receiving counseling were substantially more likely to obtain loan modifications and that early counseling increased the likelihood that delinquent borrowers would bring their loans current.

49. HUD does not administer this nationwide network solely through direct relationships with individual HCAs. Rather, the Program operates through intermediary organizations that oversee and support networks of HUD-approved HCAs. HUD identifies State Housing Finance Agencies ("SHFAs"), Multi-State Organizations ("MSOs"), and regional and national intermediaries as intermediary organizations within the Program. *Id.* at 4.

50. These intermediaries operate at the national, regional, and state levels and provide oversight and support to networks of HCAs. Their responsibilities include supporting participating agencies, providing training and technical assistance, and monitoring agencies for compliance with HUD's program requirements.

51. HUD's intermediary structure therefore permits the federal government to administer housing counseling services through a nationwide network of organizations while maintaining program-wide standards and oversight. HUD provides funding, training, technical support, and program requirements; intermediaries oversee and support networks of HCAs; and HCAs and their counselors provide services directly to households in communities throughout the country.

52. The Program has thus developed into a substantial nationwide infrastructure for delivering housing counseling services. It encompasses thousands of HUD-approved agencies and counselors and reaches millions of households annually, including households facing homelessness, foreclosure, financial distress, and other housing challenges.

53. The federal funding provided through HUD's Housing Counseling Program is integral to the operation of this nationwide network. HCAs and intermediary organizations rely on HUD funding, training, technical assistance, and program requirements in planning and delivering counseling services, maintaining staff, and serving households in their communities.

## II. Congressionally Appropriated Funding for the CHC Program

54. Congress has consistently appropriated funds for the CHC program in annual appropriations acts. Congress appropriates the funds with a two-year period of availability to obligate the funds, as opposed to most appropriations that are available just for the fiscal year in which they appropriated. Funds for the CHC program thus remain available to award to recipients through the end of the next fiscal year after which the funds were appropriated.

55. In FY 2024, Congress appropriated $57.5 million "[f]or contract, grants, and other assistance excluding loans" under the Housing Counseling Program, with the funds to remain available to obligate until September 30, 2025. Consolidated Appropriations Act of 2024, Pub. L. 118-42, Div. F, title II, 138 Stat. 25, 367 (2024) ("2024 Appropriations Act"). For this $57.5 million, Congress specified "[t]hat funds shall be used for providing counseling and advice to tenants and homeowners, both current and prospective, with respect to property maintenance, financial management or literacy, and such other matters as may be appropriate to assist them in improving their housing conditions, meeting their financial needs, and fulfilling the responsibilities of tenancy or homeownership; for program administration; and for housing counselor training." *Id.*

56. On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds that were appropriated to HUD in the 2024 Appropriations Act, $57.5 million, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4 §§ 1101(a)(12), 1101(b)–1108, 139 Stat. 9, 10-12 (2025) (the "2025 Continuing Resolution").

57. Under the 2025 Continuing Resolution, each appropriation carries the same period of availability as it had in the 2024 Appropriations Act. *Id.* § 1103. The $57.5 million appropriated in the 2025 Continuing Resolution for the Housing Counseling Program therefore carried a two-year period of availability, with these funds expiring on September 30, 2026.

58. For the President's budget proposal for Fiscal Year 2026, the Administration proposed eliminating all funding to the Housing Counseling Program: "The Budget does not

provide for the Housing Counseling program." Technical Supplement to the 2026 Budget: Appendix at 478.[4]

59. In the Consolidated Appropriations Act of 2026, Congress enacted a rider prohibiting the Executive Branch from unilaterally cutting funding for programs for which they had proposed cutting funding in any of the President's budget proposals, unless Congress actually enacted a rescission of the funds. Congress provided: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." Pub. L. 119–75, Div. E, title VII, § 739, 140 Stat. 173, 502 (2026) ("2026 Appropriations Act").

60. As applied here, because the President's budget proposed reducing the funding for the CHC program and Congress did not enact that proposal, the Executive Branch may not "eliminate" or "reduce" funding for the Program "until such proposed change is subsequently enacted in an appropriation Act." But Defendants have unilaterally cut the program's funding anyway.

## III. HUD's Regulations Governing Individualized Housing Counseling

61. HUD's housing counseling regulations are principally codified at 24 C.F.R. Part 214, implementing Section 106 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701x. The regulations govern who may participate in HUD's Housing Counseling Program, what counseling must look like, counselor certification, agency performance, grant funding, reporting, and oversight. They apply not just to entities receiving program grants but broadly to organizations

[4]Avaliable at, https://www.govinfo.gov/content/pkg/BUDGET-2026-APP/pdf/BUDGET-2026-APP.pdf

providing housing counseling "required under or provided in connection with HUD programs." 24 C.F.R. §§ 214.1, 214.3.

62. An organization must satisfy detailed requirements under § 214.103 to become a HUD-approved housing counseling agency. To remain HUD-approved, agencies must continuously satisfy Part 214's approval standards and implement their approved work plans. 24 C.F.R.§ §§ 214.303-214.309.

63. The regulations provide that funding for the Housing Counseling Program "depends on appropriations from Congress, and are awarded competitively under Federal and HUD regulations and policies governing assistance programs[.]" 24 C.F.R. 214.311. The regulations state that HUD will notify the public through a Notice of Funding Availability (NOFA) or NOFO in the Federal Register and by the Internet or other electronic media if housing counseling grant funds become available that are to be competitively awarded. *Id.*

64. The regulations distinguish individualized "counseling" from group "education." HUD's regulations define "counseling" as counselor-to-client assistance addressing the client's unique financial circumstances or housing issues and focusing on specific obstacles to achieving a housing goal. Counseling requires an individualized action plan. Education consists of classes with an established curriculum on subjects such as homebuying, budgeting, fair housing, rental rights, and predatory lending. 24 C.F.R. § 214.3.

65. The regulations provide that "[a]ll participating agencies that offer group educational sessions must also offer individual counseling on the same topics covered in the group educational sessions." 24 C.F.R. § 214.300(a)(7).

66. Pre-purchase and homebuying counseling and foreclosure prevention are expressly recognized housing counseling topics. 24 C.F.R. § 214.300(e).

67. For homeownership counseling specifically, agencies are expected to address the entire homeownership process, including the decision to buy, financing, purchase, inspection, ownership, refinancing, default and foreclosure, and eventual disposition of property. 24 C.F.R. § 214.300(a)(8).

68. Nothing in the regulations limits foreclosure-prevention counseling to homeowners with federally backed mortgages.

## FACTUAL BACKGROUND

### I. HUD's Mismanagement of the FY 2025 CHC Program

#### A. HUD Failed to Timely Issue the FY 2025 CHC NOFO

69. The CHC program ordinarily operates on an annual funding cycle beginning October 1 and ending September 30.

70. The FY 2025 NOFO was not issued until March 26, 2026, approximately five months after the prior grant period (and its funding) ended (on October 1, 2025). The application deadline was May 26, 2026, almost seven months after the prior grant period (and its funding) ended.

71. The NOFO provided that the resulting award period would purportedly begin retroactively on October 1, 2025.

72. During the five-month period between October 1, 2025, and issuance of the NOFO, HUD-approved intermediaries and housing counseling agencies, like Plaintiffs, lacked certainty regarding whether and on what terms their programs would be funded. Plaintiffs and other intermediaries and HCAs nevertheless continued providing counseling services to clients, incurring costs that would not be reimbursed until HUD awarded the FY 2025 awards.

73. HUD-approved intermediaries and HCAs, like Plaintiffs, were forced to drain reserves, reduce services, defer expenditures, and in some cases lay off employees or withdraw from the HUD program.

74. This was highly disruptive for Plaintiffs and other HUD-approved intermediaries and HCAs because they did not know whether their expenses would be reimbursed, could not responsibly budget around an unidentified funding regime, and faced substantial uncertainty about whether services historically reimbursed by HUD would remain eligible.

75. HUD's failure to timely issue the FY 2025 NOFO and make the appropriated funds available to HUD-approved intermediaries and HCAs who, like Plaintiffs, applied for grant awards, caused immediate and ongoing harm to Plaintiffs.

### B. HUD Imposed New Substantive Funding Restrictions and Unlawful and Unconstitutional Post-Award Conditions in the Terms of the NOFO

76. The FY 2025 NOFO implemented new restrictions on the use of federal funds to cover services required by the housing counseling authorizing statute and by HUD's regulations.

77. Additionally, the FY 2025 NOFO imposed unlawful and unconstitutional post-award conditions with which HUD-approved intermediaries and agencies, like Plaintiffs, were required to comply.

78. With regard to the change in services that HUD deemed eligible for federal funds, the NOFO provided that program funds may not be used for one-on-one pre-purchase housing counseling. *See* FY 2025 NOFO.

79. The NOFO further limited reimbursable post-purchase homeownership counseling to counseling provided to an "eligible homeowner," which the NOFO defined as a borrower with a single-family mortgage loan that is made, insured or guaranteed, or held by HUD, the Department of Veterans Affairs, or the Department of Agriculture. *Id.* Thus, grantees could no longer use

federal funds to cover foreclosure prevention services they provided to individuals with non-federally backed loans.

80. The NOFO expressly incorporated unlawful and unconstitutional post-award conditions by providing that grantees must comply with "[i]mplementing Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law," and identified, among others, Executive Order 14168 concerning "Gender Ideology," Executive Order 14151 concerning government "DEI Programs and Preferencing," and Executive Order 14173 concerning "Ending Illegal Discrimination." *Id.* The NOFO further provided that "[a]ll agreements or contracts made with subrecipients under this NOFO must contain the identical terms and conditions as those in the grant agreement issued by HUD." *Id.*

81. In Executive Order 14168, the President announced that it was "the policy of the United States to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." Exec. Order No. 14168 § 2, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" E.O.). That executive order directed federal agencies to "ensure grant funds do not promote" what the Administration deemed to be the "false" idea that a person can have a gender identity that differs from their biological sex. *Id.* § 3(g).

82. In Executive Order 14151, the President called for the termination of all "illegal DEI" and "diversity, equity, inclusion, and accessibility (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* at § 2. He also ordered all agency heads to provide the Director of OMB with a list of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." *Id.* at § 2(c).

83. In Executive Order 14173, the President required that every grant award contain a term requiring the grant recipient "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* at § 3(b)(iv)(B).

84. The new restrictions on which services HUD deemed eligible for federal funding under the program materially altered the scope of the CHC program.

85. HUD's decision to no longer allow grantees to use federal funds for services required by the governing statute and regulations constitutes a sudden and unexplained departure from longstanding agency policy.

86. For more than thirty years, HUD has funded individualized pre-purchase housing counseling and foreclosure-prevention services regardless of whether an individual had a federally backed loan.

87. The statute does not authorize HUD to impose the new funding restrictions which deem services required by the program to be ineligible for reimbursement with federal funds.

88. Nor does the statute authorize HUD to impose the unlawful conditions that the FY25 NOFO imposes.

89. HUD's funding restrictions are in contravention of the regulations that govern the housing counseling program, which specifically require that grantees provide the services HUD has now deemed ineligible for reimbursement.

90. In making the decision to prohibit the use of CHC grant funds to cover pre-purchase individual housing counseling and foreclosure prevention services to non-federally backed loan holders, HUD failed to consider important aspects of the problem. The decision is unreasoned and unexplained, lacks any evidence-based support, and fails to consider the substantial reliance interests.

91. Further, HUD's inclusion of unlawful and unconstitutional post-award conditions in the FY 2025 NOFO fails to consider important aspects of the problem, is unreasoned and unexplained, lacks any evidence-based support, and fails to consider the substantial reliance interests.

### D. HUD Failed to Make the Appropriated Funds Available by its own August 2026 Deadline

92. HUD's FY2025 NOFO established a performance period start date of October 1, 2025, yet HUD did not publish the FY2025 NOFO until March 26, 2026.

93. HUD established an application deadline of May 26, 2026, and an anticipated award date of August 3, 2026.

94. Despite the congressional appropriation and the statutory directive that the Secretary "shall make financial assistance available" to HUD-approved intermediaries and housing counseling agencies, HUD has failed to make the FY2025 Housing Counseling Assistance funds available to Plaintiffs by its stated deadline of August 2026.

## II. The September 25, 2026 Purported Rescission of HUD Housing Counseling Funds

95. On September 25, 2026—just five days before the September 30, 2026 deadline for obligating the CHC funds—OMB prepared and President Trump transmitted to Congress a special message pursuant to the Impoundment Control Act, proposing eleven rescissions of previously appropriated funds totaling approximately $810 million. The package included a proposal to rescind $56.1 million from HUD's CHC program—nearly all of the $57.5 million Congress appropriated for the CHC program in the 2025 Continuing Resolution. *See* Rescission Proposal No. R26-10 (Sept. 25, 2026).

96. The White House publicly announced the package as an exercise of unilateral cancellation authority. In a statement, OMB declared that the President was "utilizing a pocket

rescission for another nearly $1 billion of the most harmful government spending." *President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending* (Sept. 25, 2026) ("OMB Statement").[5]

97. Under the Administration's asserted "pocket-rescission" theory, which it has articulated in prior litigation, the Executive may withhold funds proposed for rescission during Congress's 45-day review period even if the funds expire before that period ends, allowing the funds to lapse unspent without Congress enacting a rescission. *See* Appl. for Partial Stay at 24–25, *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 25A269 (U.S. Sept. 8, 2025).

98. Defendant Vought confirmed this theory in a Fox News interview on September 28, 2026, stating that the ICA "allows us to send something up, basically as a notification, and then the money evaporates at the end of the fiscal year."[6]

99. The formal rescission proposal sent to Congress expressly identified the perceived ideology of CHC grantees as a reason for unilaterally eliminating their funding. Its justification stated: "Grantees have included NGOs with divisive and DEI-centric agendas that peddle discrimination based on race." Rescission Proposal No. R26-10. The proposal also incorrectly asserted that the program had not demonstrated reduced mortgage delinquencies among counseled homebuyers. *See id.*

100. OMB's accompanying announcement elaborated on the viewpoint-discriminatory motivations for refusing to spend Congress's appropriations for the program. It described the proposed CHC cut under the heading "HUD Counseling Support for NGOs that Peddle DEI and

[5] Available at https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending/ (last visited Sept. 29, 2026).
[6] Video posted by Acyn (@Acyn), X (Sept. 28, 2026), https://x.com/Acyn/status/2104670616838410457?s=46.

Discriminate Based on Race ($56 million).” OMB Statement. It asserted that the program “focuses on grantees with DEI-centric discriminatory agendas,” characterizing the grantees as “radical groups,” and identified three organizations as “[e]xamples of the radical groups that received tax dollars.” *Id.* For each organization, the White House singled out its perceived political orientation and particular views or advocacy that the Administration disfavors. *See id.*

101. OMB specifically identified Plaintiff National Urban League’s criticism of President Trump and positions on immigration enforcement, foreign policy, and access to healthcare. Referring to prior funding of “$1.6 million to National Urban League,” the statement condemned the organization as “another far left NGO that calls for the defunding of DHS and ICE under the Trump Administration, condemns President Trump for bringing Venezuelan dictator Nicolas Maduro to justice, and advocates for healthcare for illegal immigrants.” *Id.* The Administration thus expressly invoked Urban League’s criticism of the President and opposition to his policies as reasons for eliminating CHC funding.

102. OMB similarly identified Plaintiff Housing Action Illinois’s views on housing and racial justice. Referring to prior funding of “$1.5 million to Housing Action Illinois,” it described the organization as “a radical left NGO” that believes “housing is a human right” and is committed to “advancing equitable community development and affirmatively furthering racial justice.” *Id.* Those statements identify the organization’s beliefs and advocacy as grounds for the Administration’s condemnation.

103. OMB also identified UnidosUS, formerly the National Council of La Raza, for its views on immigration and structural racism. It described UnidosUS as “a far-left NGO that supports sanctuary city policies, amnesty for illegals, and is ‘committed to showing all Americans what structural racism is.’” *Id.* As with Plaintiffs Urban League and Housing Action Illinois, the

White House identified the organization's ideology, political positions and public advocacy in explaining why it was eliminating CHC funding.

104. The purported speech and advocacy that the Administration identified as objectionable occurred outside the CHC program, was unrelated to the grantees' performance of the housing counseling services funded by that program, and was neither paid for nor otherwise supported by CHC funds. The three organizations singled out by the OMB statement expressed their views independently, in their own capacities, through their advocacy on matters of public concern. Their positions on immigration enforcement, foreign policy, healthcare, housing rights, and racial justice were not part of the counseling and education that HUD funded them to provide. The Administration's stated objections thus concern those organizations' independent expression beyond the federally funded program.

105. Similarly, the Administration's sweeping characterization of all grant participants as "radical groups" with "DEI-centric discriminatory agendas" that "Peddle DEI and Discriminate Based on Race" bears no connection to the recipients' performance under, or compliance with, the CHC program.

106. Defendants are using the cancellation of housing counseling funds to punish grantees for that independent expression. OMB expressly identified the organizations' perceived political affiliations, policy positions, and criticism of President Trump as reasons for eliminating CHC funding. Those statements make clear that Defendants' objections extend to who the grantees are, what they believe, and what they say outside the CHC program. And the statements confirm that the proposed rescission is not based upon the inefficiency of the program or its failure to further program goals.

107. Defendants selected the CHC funds for cancellation because they disfavor the

grantees' perceived viewpoints and seek to retaliate against grantees, including Plaintiffs, for their protected speech and advocacy. By withdrawing funding on those grounds, Defendants are imposing a financial penalty for expression and viewpoints that the government neither funded nor commissioned.

## III. The Impact of Defendants' Actions on Plaintiffs

108. Defendants' actions have harmed and will continue to harm Plaintiffs by threatening their ability to maintain CHC programs and activities supported by federal funding and to carry out their mission. Plaintiffs rely on HUD's CHC funding to operate and sustain their housing counseling programs, serve low- and moderate-income communities, and carry out their organizational missions. Plaintiffs invested substantial time and resources preparing for and competing for CHC funding, developed annual budgets and program plans in reliance on anticipated federal support, and maintained staffing and program capacity to provide HUD-supported services.

109. The rescission deprives Plaintiffs of funding they reasonably expected to receive, requires them to reduce, reallocate, or eliminate housing counseling services and personnel, and impairs their ability to serve existing and prospective clients. It also harms Plaintiffs by impairing their ability to compete for and obtain future CHC awards and by disrupting longstanding relationships with the communities, clients, and partner organizations that depend on their housing counseling programs. As a result, Defendants' actions directly interfere with Plaintiffs' programs, operations, organizational missions, and ability to provide critical housing counseling services to the communities they serve. For example:

110. NCHC has historically relied on federal funding to carry out its mission, including a $798,235 HUD Comprehensive Housing Counseling grant awarded for FY2024. HUD's failure to timely make awards under the FY 2025 NOFO harms NCHC, its members, and the individuals

and families they serve, who face a devastating loss of support. NCHC anticipates that its FY 2025 NOFO award will be $100,000–$300,000.

111. NCHC has publicly opposed and criticized actions by the Trump Administration concerning fair housing, racial equity, LGBTQ+ protections, and immigration, and has participated in litigation challenging Administration policies. For example, in 2025, NCHC participated in litigation challenging the Administration's implementation of its executive order concerning diversity, equity, and inclusion ("DEI") and became a named plaintiff in *Elev8 Baltimore, Inc. v. Corporation for National and Community Service*, challenging the termination of its AmeriCorps VISTA grant. *See Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.,* 2025 WL 1865971, at *1 (D. Md. July 7, 2025). The rescission of its federal funding has impaired NCHC's ability to carry out its CHC program and commitments supported by HUD's funding and to serve its partner organizations. The rescission also threatens to chill NCHC's future advocacy. NCHC expects to continue seeking federal funding, but the Administration's actions have sent a clear message that organizations that publicly criticize its policies risk losing federal support, causing NCHC to reasonably fear that continued advocacy may jeopardize future grants.

112. Urban League has consistently received federal funds since 1973 to carry out its mission. Urban League has publicly opposed and criticized actions by the Trump Administration concerning racial equity, DEI, LGBTQ+ rights, and federal funding. For example, in 2025, Urban League became a named plaintiff in *National Urban League v. Trump*, challenging Executive Orders 14151, 14168, and 14173 and their restrictions on DEI programs and federal funding. *See Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025). Urban League has also publicly condemned the Administration's efforts to restrict federal funding based on DEI-related activities. The Administration's actions threaten Urban League's ability to maintain its CHC program funded

by HUD and have chilled its advocacy. Urban League expects to continue seeking federal funding, but reasonably fears that continued criticism of Administration policies could jeopardize its existing and future grants.

## CAUSES OF ACTION

### COUNT I
### Violation of the First Amendment
### Viewpoint Discrimination

113. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

114. Plaintiffs may assert an equitable cause of action to enjoin federal officials from carrying out constitutional violations, including violations of the First Amendment. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

115. Defendants violated the First Amendment by eliminating funding for the CHC program, and the program as a whole, based on disfavor toward Plaintiffs' and others' protected speech, expressive activities, and viewpoints that have no bearing on the funding or activities under the program. This is not a case about whether the federal government may subsidize speech that advances policies the Administration disfavors; it is a case of the Administration defunding and shutting down a program because it does not like the non-program-related viewpoints of the organizations that receive the funding.

116. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I.

117. One core feature of the First Amendment is that the government may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

118. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The government may not "use [its] power… to punish or suppress disfavored expression." *Id.* at 188.

119. In announcing the transmission of its request to rescind $56 million in CHC funding, Defendants pointed to grantees' constitutionally protected viewpoints and speech as the basis of their decision. *President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending*, The White House (Sept. 25, 2026).[7] They state broadly that the CHC program has provided funding to "grantees with DEI-centric discriminatory agendas," who are "radical groups." *Id.*

120. They went further to point to specific protected statements by particular prior grantees, unrelated to the CHC program. In each of the examples provided, Defendants described the grantees as a "far left" or "left" NGO and then quoted protected speech they had engaged in. *Id.* With respect to the National Urban League, Defendants described it as a "far left NGO that calls for the defunding of DHS and ICE under the Trump Administration, condemns President Trump for bringing Venezuelan dictator Nicolas Maduro to justice, and advocates for healthcare for illegal immigrants." *Id.* Similarly, it framed Housing Action Illinois as a "radical left NGO" and complained that as an organization they are committed to "advancing equitable community development and affirmatively furthering racial justice." *Id.* And they stated that UnidosUS supports

---

[7]Available at, https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending/

sanctuary cities and pointed to the organization's work relating to countering structural racism. *Id.*

121. Further, HUD's FY 2025 CHC NOFO imposes conditions on access to CHC funding that require participating organizations to adopt the Government's viewpoints as their own to comply with specified Presidential Executive Actions concerning, among other things, "gender ideology," and diversity, equity, and inclusion programs and preferences.

122. The NOFO also materially restricts the housing counseling activities for which CHC funds may be used, including by limiting reimbursement for one-on-one housing counseling to specified categories and limiting reimbursable post-purchase counseling to "eligible homeowners" as defined by the NOFO.

123. These funding restrictions and conditions interfere with Plaintiffs' ability to provide housing counseling and engage in related speech and expressive activities.

124. Defendants' actions impermissibly leverage the availability of federal funding to burden or suppress protected expressions. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013).

125. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered and continue to suffer loss of funding, disruption to their housing counseling operations, financial harm, and chilling of protected speech and expressive activities.

**COUNT II**
**Violation of the First Amendment**
**Retaliation**

126. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

127. Plaintiffs have engaged in speech, association, advocacy, and litigation on matters

of public concern protected by the First Amendment, including housing access, fair housing, economic inequality, civil rights, racial equity, discrimination, diversity, inclusion, and accessibility, as well as criticism of Trump administration policies and values regarding those issues.

128. Defendants considered and disapproved of Plaintiffs' First Amendment activity, as evidenced by the OMB Statement, which categorically described grant recipients as "radical groups" with "DEI-centric discriminatory agendas" that "Peddle DEI and Discriminate Based on Race."

129. The Trump administration's stated justification for rescission did not identify grantee-specific deficiencies such as fraud, misuse of funds, or noncompliance, but rather condemned the recipient organizations' purported missions, viewpoints, and advocacy.

130. As retaliation for certain grant recipients' disfavored protected activity, Defendants rescinded approximately $56 million of the $57.5 million appropriated by Congress for the CHC program—more than 97% of its funding—thereby subjecting Plaintiffs and other grantees to the same adverse action. Defendants did so based on a categorical approach that treated all program recipients as objectionable based on protected activity that the administration associated some with certain grantees.

131. Plaintiffs' protected activity was a substantial, motivating, and but-for cause of Defendants' rescission of CHC funds.

132. By rescinding CHC funding because Plaintiffs and other program recipients expressed, advanced, associated with, or were perceived to hold views disfavored by the Administration, Defendants caused Plaintiffs to suffer concrete financial and operational harms.

133. Plaintiffs currently participate in other federal grant programs or intend to

participate in the future in the CHC or other HUD programs, but Defendants' retaliation is likely to chill Plaintiffs' protected activity and would deter an organization of ordinary firmness in Plaintiffs' position from continuing to engage in protected activity disfavored by the Administration.

134. "The First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quotations omitted). Defendants' actions were taken in response to Plaintiffs' protected speech or expressive activities, constituting unconstitutional retaliation. *Id.*

**COUNT III**
**APA – Contrary to Law, 5 U.S.C. § 706(2)(A), (C)**
**Violations of the 2025 Continuing Resolution, 12 U.S.C. § 1701x,**
**and the 2026 Appropriations Act Rider**

135. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

136. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

137. HUD and OMB have made a final decision that HUD will not obligate, by the deadline set by Congress, the full amount that Congress appropriated in the 2025 Continuing Resolution for the CHC program. Specifically, HUD and OMB have decided that HUD will not obligate at least $56.1 million of the $57.5 million that Congress appropriated for the CHC program in the 2025 Continuing Resolution. The decision not to obligate these appropriations is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

138. That decision violates the 2025 Continuing Resolution because Congress mandated that HUD obligate the full amount appropriated for the CHC program. It is a central tenet of appropriations law that, absent an express indication from Congress to the contrary, an appropriation mandates that the agency obligate the full amount appropriated before the funds expire. In the 2024 Appropriations Act, as re-enacted in the 2025 Continuing Resolution, Congress did not provide HUD discretion to spend less than the full amount appropriated for the CHC program. To the contrary, Congress required that the funds "*shall be used* for providing counseling and advice to tenants and homeowners, both current and prospective, with respect to property maintenance, financial management or literacy, and such other matters as may be appropriate to assist them in improving their housing conditions, meeting their financial needs, and fulfilling the responsibilities of tenancy or homeownership; for program administration; and for housing counselor training." 2024 Appropriations Act, 138 Stat. at 367.

139. HUD must comply with Congress's mandate to obligate the full $57.5 million appropriated unless Congress actually rescinds the funds in a bill that the President signs. Congress has not rescinded any of the $57.5 million appropriated for the CHC program under the 2025 Continuing Resolution.

140. HUD and OMB have also made a final decision to eliminate the CHC program and not provide financial assistance to HUD-approved housing counseling agencies and State housing finance agencies. That decision is also a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

141. Specifically, Defendants' actions violate Congress's mandate that HUD establish and maintain the CHC program, and that under the program the HUD Secretary "shall make

financial assistance available under this paragraph to HUD-approved housing counseling agencies and State housing finance agencies." 12 U.S.C. § 1701x(a)(4)(A).

142. By proposing rescission of $56 million of the $57.5 million appropriated for Housing Counseling, the Department has largely shut down this statutorily-required program. Defendants thus have made a final decision and taken final agency action to not maintain the HUD Housing Counseling program. At a minimum, Defendants have made a final decision and taken final agency action to not maintain the Housing Counseling program for an extended period of time.

143. Defendants have also made a final decision to eliminate virtually all funding for the CHC program, as proposed in the President's budget, even though Congress has not enacted a rescission of the funds in an appropriations act.

144. That violates the rider in Section 739 of 2026 Appropriations Act, which prohibits Defendants from using any funds to "eliminate[] or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act." 2026 Appropriations Act, title VII, § 739, 140 Stat. at 502.

145. Defendants' conduct therefore is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

**COUNT IV**
**APA – Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)**
**Decisions to Not Obligate Congressionally Mandated CHC Funds, to Eliminate the CHC Program, and to Not Make Awards Pursuant to the FY2025 NOFO**

146. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

147. The decisions of HUD and OMB to not obligate at least $56.1 million in funds that Congress appropriated in 2025 for the CHC program, to eliminate the CHC program and not provide financial assistance to HUD-approved housing counseling agencies and State housing finance agencies, and to not make award to entities that applied for funding on the FY2025 NOFO are all final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

148. Each of these actions is arbitrary and capricious, even if Defendants' interpretation of the ICA is correct that they are not legally mandated to obligate funds during the 45-day period after a proposal to rescind the funds is submitted to Congress. There is no plausible authority for the proposition that agencies are legally *barred* from obligating funds that have been proposed for rescission. Thus, even under Defendants' erroneous interpretation of the ICA, Defendants' decisions not to obligate funds, to eliminate the program, and to not issue awards pursuant to the NOFO are discretionary and must accord with the APA's requirements for reasoned decisionmaking.

149. Defendants provided no satisfactory explanation for their decisions. Defendants' disfavor for the perceived "agendas" of CHC program grantees, in their work outside the CHC program, is not a reasoned basis for eliminating and not funding the Program.

150. Similarly, Defendants relied upon factors Congress did not permit them to consider. Congress did not permit Defendants to consider the "agendas" of grantees in deciding whether to operate and fund the CHC program.

151. Defendants also failed to consider substantial reliance interests of those impacted by their actions. Defendants failed adequately to consider the reliance interests of Plaintiffs, other HCAs, intermediary organizations, housing counselors, and the households served through the Program. Defendants failed adequately to consider the consequences of leaving a nationwide

network of more than 2,200 HCAs and more than 6,700 housing counselors without timely access to the federal funds that Congress appropriate for the CHC program, and without the benefits of the CHC program as a whole.

152. Defendants' failure to timely obligate and make available the CHC funds was therefore arbitrary, capricious, and contrary to 5 U.S.C. § 706(2)(A).

**COUNT V**
**APA – Agency Action Unlawfully Withheld or Unreasonably Delayed, 5 U.S.C. § 706(1)**
**Failure to Obligate Funds and to Maintain the CHC Program**

153. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

154. Under 5 U.S.C. § 706(1), a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed.

155. The 2025 Continuing Resolution mandates that HUD obligate the full amount appropriated for the CHC program before the funds expire, with no discretion to spend less than those full amounts. The statute establishing the CHC program, 12 U.S.C. § 1701x, mandates that HUD operate the CHC program and provide financial assistance to HUD-approved housing counseling agencies and State housing finance agencies." These are discrete actions that HUD must take, and HUD has non-discretionary duties to comply with these commands.

156. Defendants' withholding of taking these actions is "unlawful." 5 U.S.C. § 706(1).

157. Alternatively, Defendants have "unreasonably delayed" taking these actions.

**COUNT VI**
**Ultra Vires**
**Failure to Obligate Funds, to Maintain the CHC Program, and to Comply with the 2026 Appropriations Act Rider**

158. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

159. A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

160. Defendants' refusal to obligate the full amounts that Congress required to be spent by specific deadlines, for specific purposes, is a clear departure from the appropriations acts' requirements and is blatantly lawless.

161. No statute, constitutional provision, or other source of law authorizes Defendants to fail to obligate CHC program appropriations that have not been rescinded by Congress. Nor does any statute, constitutional provision, or other source of law authorize Defendants to fail to maintain the CHC program that Congress has mandated by statute. Defendants' actions are blatantly lawless and exceed their lawful authority.

162. Defendants have also brazenly violated the specific prohibition in the 2026 Appropriations Act that they may not eliminate or reduce funding for a program for which the President's budget proposed such cuts.

163. Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful and enjoin Defendants' ultra vires actions.

**COUNT VII**
**Mandamus**
**Failure to Obligate Funds and to Maintain the CHC Program**

164. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

165. If relief is not available on Plaintiffs' APA and ultra vires claims concerning Defendants' failure to obligate congressionally mandated appropriations and failure to maintain the CHC program, the Court should enter a writ of mandamus.

166. Defendants have disregarded their clear duties to spend appropriations enacted by Congress for the CHC program and to maintain the CHC program.

167. Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials, including specifically where federal officials refuse to spend congressionally appropriated funds for policy reasons. *In re Aiken Cnty.*, 725 F.3d 255, 258, 261 n.1 (D.C. Cir. 2013).

168. Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on their other claims.

**COUNT VIII**
**Violation of the Separation of Powers**
**Failure to Obligate Funds and to Maintain the CHC Program**

169. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

170. The Constitution vests exclusive lawmaking in Congress. The Constitution further provides Congress the exclusive power of the purse with respect to federal spending.

171. The executive branch lacks the constitutional power to ignore statutory mandates because it disagrees with the policies that Congress has enacted. The executive branch has no power to decline to spend funds that Congress has mandated be spent in appropriations acts.

172. By purporting to unilaterally cancel congressionally mandated appropriations, Defendants have usurped Congress's core constitutional power of the purse, in violation of the separation of powers of the Constitution,

173. Plaintiffs are entitled to declaratory and injunctive relief on these constitutional violations.

**COUNT IX**
**Violation of the Spending Clause**
**Conditions Unauthorized by Congress**

174. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

175. Under the Spending Clause, Congress—not an administrative agency acting alone—establishes the terms upon which federal funds are made available.

176. To the extent HUD has imposed new conditions on CHC funds that Congress did not authorize, HUD has usurped Congress' exclusive powers under the Spending Clause.

177. The challenged conditions also violate the Spending Clause because they are not reasonably related to the statutory purpose of the Housing Counseling Program, which is to provide counseling and assistance designed to help families obtain, sustain, and retain their homes.

**COUNT X**
**Violation of the Presentment Clause**
**Unilateral Presidential Cancellation of Funds**

178. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

179. If Defendants' interpretation of the ICA were correct—in that 2 U.S.C. § 683(b) authorizes agencies to refrain from obligating appropriations for 45 legislative days no matter what, even if that extends beyond the expiration of funds—then 2 U.S.C. § 683(b) and Defendants' use of it violates the Presentment Clause and is unconstitutional.

180. Defendants' interpretation of 2 U.S.C. § 683(b) would render the ICA functionally identical to the Line-Item Veto Act, which the Supreme Court held violated the Presentment Clause in *Clinton v. City of New York*, 524 U.S. 417, 448 (1998).

181. Defendants' theory is that the ICA permits the President to cancel statutory spending requirements in appropriations acts like the 2025 Continuing Resolution, merely by submitting a "special message" to Congress proposing the funds for rescission less than 45 legislative days before the funds expire, so long as Congress does not step in and vote down the proposal.

182. Likewise, the Line-Item Veto Act allowed the President to send a special message to Congress that he intended to cancel appropriations, and the cancellation would be effective unless Congress affirmatively stepped in and passed a disapproval bill.

183. Just like with the Line-Item Veto Act, under Defendants' theory of the ICA, "[i]n both legal and practical effect," the President may amend appropriations laws through a unilateral submission of a special message to Congress, even if Congress does not itself amend those laws through new legislation. *Clinton*, 524 U.S at 438. But "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," and the "constitutional silence on this profoundly important issue [is] equivalent to an express prohibition" on the President taking such action. *Id.*

184. Thus, if 2 U.S.C. § 683(b) authorizes Defendants to refuse to spend appropriations merely because the President has sent a rescission proposal to Congress, then the statute violates the Presentment Clause, as does Defendants' use of the statute to unilaterally rescind CHC appropriations.

185. Plaintiffs are entitled to declaratory and injunctive relief on these constitutional violations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendants and award the following relief:

1. Declare unlawful and preliminarily and permanently enjoin Defendants' refusal to obligate all appropriated funds for CHC program as violating the First Amendment.

2. Stay, declare unlawful, and preliminarily and permanently enjoin Defendants' decision not to obligate the full amount appropriated in the 2025 Continuing Resolution for the CHC program, as required by the 2025 Continuing Resolution.

3. Stay, declare unlawful, vacate, and preliminarily and permanently enjoin Defendants' decision not to maintain the CHC program as required under 12 U.S.C. § 1701x;

4. Stay, declare unlawful, vacate, and preliminarily and permanently enjoin Defendants' decision to eliminate or reduce funding the CHC program, as proposed in the President's budget, in violation of Section 739 of 2026 Appropriations Act;

5. Compel Defendants to obligate the full amount appropriated in the 2025 Continuing Resolution for the CHC program by September 30, 2026, or such other deadline as the Court provides;

6. Compel Defendants to maintain the CHC program as required under 12 U.S.C. § 1701x;

7. Pursuant to 31 U.S.C. § 1502(b) and the Court's equitable authority, suspend the September 30, 2026 expiration of the unobligated CHC funds at issue and preserve their availability for obligation pending further order of the Court, including, as necessary, beyond that date; enjoin Defendants from transferring, reprogramming, or otherwise disposing of those funds

in a manner that would frustrate effective relief; and require Defendants to take all steps within their respective authority necessary to effectuate that preservation;

8. Declare that HUD's challenged NOFO provisions and related funding restrictions are unlawful;

9. Declare that HUD's challenged restrictions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

10. Declare that HUD acted in excess of its statutory and regulatory authority;

11. Declare that HUD's failure to timely make available and/or disburse congressionally appropriated CHC funds constitutes agency action unlawfully withheld or unreasonably delayed, to the extent the governing law imposes a discrete duty to act;

12. Vacate the challenged provisions of the CHC NOFO and any related agency action implementing those provisions;

13. Enjoin HUD from enforcing the challenged restrictions against Plaintiffs and participating housing counseling agencies;

14. Enjoin HUD from withholding, delaying, terminating, or conditioning CHC funds based on the challenged restrictions;

15. Order HUD, to the extent required by the governing appropriations and authorizing statutes, to make available and/or disburse the appropriated CHC funds without applying unlawful conditions;

16. Retain jurisdiction as necessary to ensure compliance with the Court's judgment;

17. Award Plaintiffs their reasonable attorneys' fees and costs to the extent authorized by law; and

18. Grant such other relief as the Court deems just and proper.

Dated: September 29, 2026

/s/ Lindsay W. Zimliki
Lindsay W. Zimliki (D.C. Bar No. 475890)
Norman L. Eisen (D.C. Bar No. 435051)
Tianna J. Mays (D.C. Bar No. 21597)
Andrew Warren (D.C. Bar No. 503003)
Taryn Wilgus Null (D.C. Bar No. 985724)
Zsa'Queria Martin (D.C. Bar No. 90043047)

Democracy Defenders Fund
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003

lindsay@democracydefenders.org
norman@democracydefenders.org
tianna@democracydefenders.org
andrew@democracydefenders.org
taryn@democracydefenders.org
zsaqueria@democracydefenders.org

/s/ Daniel F. Jacobson
Daniel F. Jacobson (D.C. Bar No. 1016621)
Lynn D. Eisenberg (D.C. Bar No. 1017511)
Stephen K. Wirth (D.C. Bar 1034038)
Nina C. Cahill (D.C. Bar No. 1735989)

Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, D.C. 20016

dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
stephen@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com

/s/ Benjamin B. Klubes
Benjamin B. Klubes (D.C. Bar No. 428852)
Klubes Law Group
1717 K Street NW, Suite 900
Washington, D.C. 20006
bklubes@klubeslaw.com

*Counsel for Plaintiffs*