**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

NATIONAL URBAN LEAGUE, et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, et al.,

*Defendants*.

Civil Action No. 1:26-cv-03401

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND, WITH EXPEDITED CONSIDERATION**

## TABLE OF CONTENTS


**INTRODUCTION** **1**

**BACKGROUND** **3**

I. Congress Created the Comprehensive Housing Counseling Program, Has Consistently Appropriated Funds for It, and Mandated that That HUD Obligate $57.5 Million by September 30, 2026 for the FY 2025 CHC Program 3

II. HUD Delayed the FY 2025 CHC NOFO, which Imposed New Funding Restrictions and Post-Award Conditions, and Failed to Award the Funds by its Stated Deadline 6

III. The Trump Administration Unilaterally Decided not to Obligate the Congressionally Appropriated Housing Counseling Funds, Based on the Viewpoints and Advocacy of Participating Organizations 7

IV. Defendants' Actions Harm Plaintiffs 10

**LEGAL STANDARD** **12**

**ARGUMENT** **12**

I.Plaintiffs Are Likely to Succeed on the Merits 12

A. Defendants' Actions Violate the First Amendment 12

1. Defendants' Refusal to Obligate CHC Funds Reflects Viewpoint Discrimination 13

2. Defendants separately violated the First Amendment by retaliating 17

against Plaintiffs for protected speech and petitioning activity. 17

a. Plaintiffs engaged in constitutionally protected activity 17

b. The CHC rescission constitutes adverse action 20

c. There is a causal link between Defendants' actions and Plaintiffs' protected activity 22

B. Defendants' Anticipated Arguments Based on the ICA Are Unavailing 25

1. The ICA does not preclude Plaintiffs' First Amendment claims 25

2. The ICA does not authorize Defendants' conduct on the merits 28

II. Plaintiffs Face Irreparable Harm 33

III. The Balance of Equities and Public Interest Favor Temporary Relief 37

IV. The Requested Relief Is Necessary to Provide Complete Relief 40

**CONCLUSION** **41**

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ........ 12

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........ 13, 14, 28

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 2576702 (D.D.C. Sept. 5, 2025) ........ 32

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018) ........ 33

*Arnett v. Kennedy*, 416 U.S. 134 (1974) ........ 21

*Assoc. Press v. Budowich*, 780 F. Supp. 3d 32 (D.D.C. 2025) ........ 39

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........ 33

*Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025) ........ 14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........ 32, 38

*Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022) ........ 40

*Connick v. Myers,* 461 U.S. 138 (1983) ........ 17

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ........ 26

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ........ 28

*Crawford-El v. Britton*, 93 F.3d 813 (D.C. Cir. 1996) ........ 28

*Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) ........ 38

*Department of State v. AIDS Vaccine Advocacy Coal.*, 146 S. Ct. 19 (2025) ........ 27, 28, 32

*Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749 (1985) ........ 17

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971 (D. Md. July 7, 2025) ........ 11, 19

*First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174 (2026) ........ 21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)........................................ 26

*Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025).................................................... 40

*Glob. Health Council v. Trump*, No. 1:25-cv-00402 (D.D.C. Sept. 25, 2026)……………… …19

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ...................................................................... 37

*Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) ................................................ 12, 17, 24

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)......................................................................... 30

*Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025)..................... 12, 37

*Kelly v. Hegseth*, 820 F. Supp. 3d 1 (D.D.C. 2026)..................................................................... 37

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)............................. 36, 39

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................... 33

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ................................. 16, 29, 33

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ................................... 33

*N.Y. Times v. Dep't of Def.*, No. CV 26-1690, 2026 WL 1872765 (D.D.C. June 30, 2026)........ 37

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 8:26-cv-1532 (D. Md. filed April 20, 2026) ....................................................................................................................... 19

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36 (D.D.C. 2025)........ 36

*Nat'l Ctr. for Learning Disabilities v. OMB*, No 1:26-cv-13019, ECT No 56 (D. Mass. Aug. 25, 2026)…………………………………………………………… ………………..26, 27

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ..................................................... 14

*Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48 (D.D.C. 2026) ........................................... 16

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .............................................................. 12

*Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253 (D.C. Cir. 1991) .......................... 33

*Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025)............................................. 11

*Nat'l Urban League v. Trump*, No. 1:25-cv-00471 (D.D.C. filed Feb. 19, 2025) ........................ 18

*Nken v. Holder*, 556 U.S. 418 (2009) ........................ 36, 37

*NRA v. Vullo*, 602 U.S. 175 (2024) ........................ 21, 31

*Perry v. Sindermann*, 408 U.S. 593 (1972) ........................ 13, 28

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ........................ 37

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ........................ 39

*Regan v. Taxation With Representation of Wash.,* 461 U.S. 540 (1983) ........................ 14

*Rhode Island Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180 (D.R.I. 2025) 14

*Rosenberger v. Rector & Visitors of Univ. of Va*., 515 U.S. 819 (1995) ........................ 12

*Rust v. Sullivan*, 500 U.S. 173 (1991) ........................ 14, 15

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ........................ 12

*Snyder v. Phelps*, 562 U.S. 443 (2011) ........................ 17

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) ........................ 28, 29

*Trump v. CASA, Inc*., 606 U.S. 831 (2025) ........................ 40

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ........................ 37

*Webster v. Doe*, 486 U.S. 592 (1988) ........................ 26

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127 (D.D.C. 2025) ........................ 14

*Wisc. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ........................ 33

**STATUTES**

12 U.S.C. § 1701x ........................ 3

12 U.S.C. § 1701x(a)(4)(A) ........................ 30

2 U.S.C. § 682(3) ........................ 31

2 U.S.C. § 681(3) ........................................................................................................ 26

2 U.S.C. § 681(4) ........................................................................................................ 31

2 U.S.C. § 683(b) ........................................................................................... 28, 31, 32

5 U.S.C. § 701(a)(1)...................................................................................................... 25

Consolidated Appropriations Act of 2024, Pub. L. 118-42, Div. F, title II, 138 Stat. 25, 367 (2024) ............................................................................................. 4, 5, 15, 31

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4 §§ 1101(a)(12), 1101(b)–1108, 139 Stat. 9, 10-12 (2025)......................................................... 5, 15, 31

Pub. L. 119–75, Div. E, title VII, § 739, 140 Stat. 173, 502 (2026) ............................ 6, 16, 29

**OTHER AUTHORITIES**

2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (A. Hamilton) (Jonathan Elliot ed., 2d ed. 1836) ............................................................... 38

Appl. for Partial Stay, *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 25A269 (U.S. Sept. 8, 2025) ............................................................................................................... 25, 28

Ltr. from Edda Emmanuelli Perez, Gen. Coun., Impoundment Control Act of 1974: Review of the President's Special Message of September 25, 2026 (Sept. 29, 2026) ............................. 30

Rescission Proposal No. R26-10 (Sept. 25, 2026)................................................................ 7, 8

Technical Supplement to the 2026 Budget: Appendix ..................................................... 5, 16, 30

The Federalist No. 58 (James Madison) (Clinton Rossiter ed., 1961)......................................... 38

U.S. Dep't of Hous. & Urb. Dev., Comprehensive Housing Counseling (CHC) and Housing Counseling Training (HCT) Notice of Funding Opportunity (FY 2025), FR-6900-N-33 (Mar. 26, 2026) ........................................................................................................................ 6

**RULES**

Local Civil Rule 65.1 ........................................ 3

**CONSTITUTIONAL PROVISIONS**

U.S. Constitutional amendment I ........................................ 12, 21

**WEB CITATIONS**

*2025–2026 Policy Agenda*, N.C. Hous. Coal. (last visited Sept. 30, 2026) ........................................ 19

*Community Justice Collaborative*, N.C. Hous. Coal. (last visited Sept. 30, 2026) ........................................ 19

*Demand Diversity*, Nat'l Urban League (last visited Sept. 30, 2026) ........................................ 18

Housing Counseling Works-Sustainable Homeownership (Dec. 2014) ........................................13

Marc H. Morial, *100 Days of Chaos Meets 100 Days of Resistance*, Nat'l Urban League (Apr. 27, 2025) ........................................ 18

Nat'l Urban League, *State of Emergency: Democracy, Civil Rights, and Progress Under Attack*, State of Black Am. Exec. Summary 3 (2025) ........................................ 18

*National Urban League, Inc.,* USA Spending (last visited Sept. 30, 2026) ........................................21

President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending, The White House (Sept. 25, 2026) ........................................ passim

Video posted by Acyn (@Acyn), X (Sept. 28, 2026) ........................................ 1, 5

## INTRODUCTION

Last Friday, late in the day, and with less than five days remaining before the September 30th deadline for the expiration of federal funding, the Trump Administration purported to unilaterally rescind nearly $1 billion in appropriated funds instead of spending the funds as Congress mandated. The Administration did so under an implausible interpretation of the Impoundment Control Act ("ICA")—a law that Congress enacted to stop impoundments—under which the Executive Branch may unilaterally rescind funding merely by waiting until close to the funds' expiration and then sending a rescission *proposal* to Congress. The orchestrator of this plan, Office of Management and Budget ("OMB") Director Russell Vought, succinctly described this "pocket rescission" theory two days ago in a TV interview, stating that the ICA "allows us to send something up, basically as a notification, and then the money evaporates at the end of the fiscal year."[1]

This case concerns one of the programs that the Administration has sought to evaporate via this and several other unconstitutional tactics: the Comprehensive Housing Counseling ("CHC") program administered by the Department of Housing and Urban Development ("HUD"). Defendants have purported to rescind virtually all of the $58 million in program funds that Congress required HUD to award to HUD-approved housing counseling intermediaries and agencies, including Plaintiffs, based on the Administration's disfavor with and in retaliation for their First Amendment activity. If Defendants have their way, this statutorily mandated program will be gone—not because Congress rescinded it or withdrew its funding, but because its participants advocate for and embrace principles the Administration opposes.

---

[1] Video posted by Acyn (@Acyn), X (Sept. 28, 2026), https://x.com/Acyn/status/2104670616838410457?s=46

Worse yet, the Executive Branch is attempting to prevent those funds from ever being used because the Trump Administration harbors animus against the perceived viewpoints and advocacy of organizations that participate in the program. Defendants said so expressly. They stated that they included these funds in the pocket rescission because the funds go to "grantees with DEI-centric discriminatory agendas," characterizing the organizations as "left" and "radical" groups. Defendants even provided examples of core protected speech by several Plaintiffs—having nothing to do with Plaintiffs' use of CHC funding or the CHC program—that underlay the decision to eliminate the funding.

By withholding the appropriated funds past their expiration date, Defendants seek to accomplish a rescission Congress has not enacted, abolish a program Congress has maintained, and punish organizations whose speech the Administration disfavors. The Constitution and the Administrative Procedure Act independently prohibits each of those actions.[2]

The need for preliminary relief is urgent as the funds at issue are set to expire **tonight**, at 11:59 p.m. September 30, 2026. This emergency is by Defendants' deliberate and calculated design, having waited until the last minute to announce their "pocket rescission." If the funds expire unspent, Plaintiffs will suffer extreme and irreparable injury. Plaintiffs will forever lose their opportunity to obtain this funding that is critical to their work, their missions, and ultimately the communities they serve. Moreover, the constitutional injuries to Plaintiffs from the abject First Amendment violations Defendants have perpetrated will be permanent if the "pocket rescission"

---

[2] Plaintiffs' Complaint asserts ten counts against Defendants, including constitutional, statutory, ultra vires, and mandamus claims, but Plaintiffs seek a temporary restraining order based only on their First Amendment claims of viewpoint discrimination (Count I) and retaliation (Count II).

accomplishes its aim. Further, the Comprehensive Housing Counseling program will effectively cease despite Congress's command that HUD administer it.[3]

Given the imminent expiration of the funds, Plaintiffs respectfully request that the Court hold a hearing on this TRO motion as early as possible today, and order HUD to obligate all remaining CHC funds before they expire at midnight tonight. Such relief is feasible because HUD already completed running the competition for the funds, and presumably already determined how to allocate the funds, before OMB put the "pocket rescission" into motion.

## BACKGROUND

### I. Congress Created the Comprehensive Housing Counseling Program, Has Consistently Appropriated Funds for It, and Mandated that That HUD Obligate $57.5 Million by September 30, 2026 for the FY 2025 CHC Program

"The Congress affirms the national goal, as set forth, in section 2 of the Housing Act of 1949, of 'a decent home and a suitable living environment for every American family'." This quote is a federal legislative affirmation, originally stated in the Housing Act of 1949, and later restated in the Housing and Urban Development Act of 1968, Pub. L. 90-448, now codified at 12 U.S.C. § 1701x. To meet this national goal, Congress created HUD's housing counseling program, which helps families obtain, sustain, and retain their homes with the help of a strong network of HUD participating housing counseling agencies and HUD certified housing counselors. To help fund the program, Congress required that HUD "*shall* make financial assistance available" "to HUD-

---

[3] Pursuant to Local Civil Rule 65.1, Plaintiffs' Counsel emailed the directors of the Federal Programs Branch of the Department of Justice and the civil head of the U.S. Attorney's Office of the District of Columbia to inform them of the filing of the complaint in this matter and the imminent filing of this motion at 6:16pm on September 30, 2026, attaching an as-filed copy of the complaint. Plaintiffs counsel is following up to provide the as-filed copies of this motion and supporting papers contemporaneously with this filing.

approved housing counseling agencies and State housing finance agencies." 12 U.S.C. § 1701x(a)(4). Specifically, under the program HUD must provide financial assistance to such organizations to provide information, advice, and technical assistance, including "counseling and advice to tenants and homeowners with respect to property maintenance, financial management, and such other matters as may be appropriate to assist them in improving their housing conditions and meeting the responsibilities of tenancy or homeownership." 12 U.S.C. § 1701x(a)(1)(iii).

The goal of the housing counseling program is to help clients maintain and improve their housing, enhance financial management and literacy, and support sustainable homeownership or affordable rental housing. The program also funds training for housing counselors nationwide. These services play a critical role in preventing housing scams and discrimination, and connecting clients to local, state, federal, and private housing resources. While the housing counseling program has evolved over the years, shifting focus from post-purchase default prevention to pre-purchase homebuyer education in the late 1990s, and then to default counseling and foreclosure mitigation during the severe housing market downturn of the late 2000s, these counseling services remain critical today.

Accordingly, Congress has consistently appropriated funds for the CHC program in annual appropriations acts. Congress appropriates the funds with a two-year period of availability to obligate the funds, meaning funding for the CHC program remains available to award to recipients through the end of the next fiscal year after which the funds were appropriated. Relevant here, in FY 2024, Congress appropriated $57.5 million "[f]or contract, grants, and other assistance excluding loans" under the CHC program, with the funds to remain available to obligate until September 30, 2025. Consolidated Appropriations Act of 2024, Pub. L. 118-42, Div. F, title II, 138 Stat. 25, 367 (2024) ("2024 Appropriations Act"). For this $57.5 million, Congress specified

"[t]hat funds shall be used for providing counseling and advice to tenants and homeowners, both current and prospective, with respect to property maintenance, financial management or literacy, and such other matters as may be appropriate to assist them in improving their housing conditions, meeting their financial needs, and fulfilling the responsibilities of tenancy or homeownership; for program administration; and for housing counselor training." *Id.*

Congress enacted a continuing resolution on March 15, 2025, that re-appropriated all of the funds that were appropriated to HUD in the 2024 Appropriations Act, $57.5 million, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4 §§ 1101(a)(12), 1101(b)–1108, 139 Stat. 9, 10-12 (2025) (the "2025 Continuing Resolution"). Under the 2025 Continuing Resolution, each appropriation carries the same period of availability as in the 2024 Act; accordingly, the $57.5 million for the CHC program expires on September 30, 2026. *See id.* § 1103.

This Administration's disdain for the housing counseling program was apparent when, in the President's FY 2026 budget proposal, the Administration proposed eliminating all funding for the CHC program. *See* Technical Supplement to the 2026 Budget: Appendix at 478 ("The Budget does not provide for the Housing Counseling program.").[4] Congress did not, however, enact the President's proposal to eliminate the funding for the CHC Program.

In fact, Congress enacted a rider to the Consolidated Appropriations Act of 2026, prohibiting the Administration from unilaterally cutting funding for programs for which it had proposed cutting funding in any budget proposal. Congress provided: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce

[4] Available at https://www.govinfo.gov/content/pkg/BUDGET-2026-APP/pdf/BUDGET-2026-APP.pdf

funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriations Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." Pub. L. 119–75, Div. E, title VII, § 739, 140 Stat. 173, 502 (2026) ("2026 Appropriations Act"). Thus, because Congress did not enact the President's proposed elimination of all CHC funding, the Executive Branch may not "eliminate" or "reduce" funding for the Program "until such proposed change is subsequently enacted in an appropriation Act."

Defendants have unilaterally and unlawfully cut the program's funding anyway.

## II. HUD Delayed the FY 2025 CHC NOFO, which Imposed New Funding Restrictions and Post-Award Conditions, and Failed to Award the Funds by its Stated Deadline

Defendants have long sought to sabotage HUD's administration of the FY 2025 CHC competition. Ordinarily, HUD would have released the NOFO prior to October 1, 2025, because that is when the period of performance begins for the CHC award – October of each year. But it was not until March 26, 2026, that HUD posted a Notice of Funding Opportunity (NOFO) for the FY 2025 CHC award. U.S. Dep't of Hous. & Urb. Dev., *Comprehensive Housing Counseling (CHC) and Housing Counseling Training (HCT) Notice of Funding Opportunity (FY 2025)*, FR-6900-N-33 (Mar. 26, 2026) ("FY 2025 NOFO"). The NOFO provided that the resulting award period would purportedly begin retroactively on October 1, 2025 and run through March 31, 2027. *Id.* at 81. The total amount of funding to be awarded was $56.1 million. *Id.* at 6.5And, the CHC

---

[5] During the five-month period between October 1, 2025, and issuance of the NOFO, HUD-approved intermediaries and housing counseling agencies, like Plaintiffs, lacked certainty regarding whether and on what terms their programs would be funded. Plaintiffs and other intermediaries and HCAs nevertheless continued providing counseling services to clients, incurring costs that would not be reimbursed until HUD awarded the FY 2025 awards. Decl. of

program funds that Congress appropriated in the 2025 Continuing Resolution would expire on September 30, 2026, if not obligated by that date.

Also, the FY 2025 NOFO imposed surprising new restrictions on the grantees' ability to use federal funds to cover services that are required by the program and that have always been reimbursed before. Further, the NOFO imposed unlawful and unconstitutional post-award conditions on grant recipients. Plaintiffs challenge these conditions and restrictions in their complaint, Compl. ¶¶ 76-91, 174–77, but do not seek immediate relief regarding them in the present motion for a temporary restraining order.

Plaintiffs and other organizations applied for awards under the FY 2025 NOFO by the application deadline of May 26, 2026. In the following months, HUD officials represented to grant applicants that the applications were being processed and awards would be announced in August 2026. Decl. of Staci A. Berger ("Berger Decl.") ¶¶ 10-11, Gunter Decl. ¶ 12, Decl. of Bonita Holmes ("Holmes Decl.") ¶¶ 15-16, Richardson Decl. ¶ 27, Young Decl. ¶ 13. But HUD never announced or made the awards.

## III. The Trump Administration Unilaterally Decided not to Obligate the Congressionally Appropriated Housing Counseling Funds, Based on the Viewpoints and Advocacy of Participating Organizations

On September 25, 2026—just five days before the September 30, 2026 deadline to obligate CHC funds—OMB prepared and President Trump transmitted to Congress a special message

---

Cy Richardson ("Richardson Decl.") ¶ 28; Decl. of Russell E. Graves ("Graves Decl.") ¶¶ 12-14; Decl. of Samuel Gunter ("Gunter Decl.") ¶¶ 11, 13, 17; Decl. of David J. Young ("Young Decl.") ¶¶ 12, 14, 19; Decl. of Seema Agnani ("Agnani Decl.") ¶¶ 16-17; Decl. of Patricia Kidd ("Kidd Decl.") ¶¶ 12-14. In doing so, they were forced to drain reserves, reduce services, defer expenditures, and in some cases lay off employees or withdraw from the HUD program. *Id.*

pursuant to the Impoundment Control Act, proposing eleven rescissions of previously appropriated funds totaling approximately $810 million. The package included a proposal to rescind $56.1 million from HUD's CHC program, nearly all of the $57.5 million Congress appropriated for the CHC program in the 2025 Continuing Resolution. *See* Rescission Proposal No. R26-10 (Sept. 25, 2026). OMB publicly announced the package as an exercise of unilateral cancellation authority. In a statement, OMB declared that the President was "utilizing a pocket rescission for another nearly $1 billion of the most harmful government spending." *President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending,* The White House (Sept. 25, 2026) ("OMB Statement").6

Under the Administration's asserted "pocket-rescission" theory, which it has articulated in prior litigation, the Executive may withhold funds proposed for rescission during Congress's 45-day review period even if the funds expire before that period ends, allowing the funds to lapse unspent without Congress enacting a rescission. See Appl. for Partial Stay at 24–25, *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 25A269 (U.S. Sept. 8, 2025). Defendant Vought confirmed this theory in a Fox News interview on September 28, 2026, stating that the ICA "allows us to send something up, basically as a notification, and then the money evaporates at the end of the fiscal year."[7]

The formal rescission proposal expressly cited CHC grantees' perceived ideology as the primary reason for unilaterally eliminating their funding, stating that "[g]rantees have included NGOs with divisive and DEI-centric agendas that peddle discrimination based on race." Rescission

[6]Available at https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending/ (last visited Sept. 29, 2026).
[7] Available at https://x.com/Acyn/status/2104670616838410457?s=46.

Proposal No. R26-10. The proposal also incorrectly asserted that the program had not demonstrated reduced mortgage delinquencies among counseled homebuyers. See *id.*

OMB's accompanying announcement elaborated on the viewpont-discriminatory motivations for refusing to spend Congress's appropriations for the program, describing the proposed CHC cut under the heading "HUD Counseling Support for NGOs that Peddle DEI and Discriminate Based on Race ($56 million)." OMB Statement. The announcement asserted that the program "focuses on grantees with DEI-centric discriminatory agendas," characterized the grantees as "radical groups," and identified three organizations as "[e]xamples of the radical groups that received tax dollars." *Id.* For each organization, the OMB singled out its perceived political orientation and particular views or advocacy that the Administration disfavors. See *id.*

OMB's statement specifically identified Plaintiff National Urban League's criticism of President Trump and positions on immigration enforcement, foreign policy, and access to healthcare. Referring to prior funding of "$1.6 million to National Urban League," the statement condemned the organization as "another far left NGO that calls for the defunding of DHS and ICE under the Trump Administration, condemns President Trump for bringing Venezuelan dictator Nicolas Maduro to justice, and advocates for healthcare for illegal immigrants." *Id.* The Administration thus expressly invoked National Urban League's criticism of the President and opposition to his policies as reasons for eliminating CHC funding.

OMB similarly identified Plaintiff Housing Action Illinois's views on housing and racial justice as a reason for eliminating the funding. Referring to prior funding of "$1.5 million to Housing Action Illinois," it described the organization as "a radical left NGO" that believes "housing is a human right" and is committed to "advancing equitable community development and

affirmatively furthering racial justice." *Id*. Those statements identify the organization's beliefs and advocacy as grounds for the Administration's condemnation.

OMB also identified UnidosUS, formerly the National Council of La Raza, for its views on immigration and structural racism. It described UnidosUS as "a far-left NGO that supports sanctuary city policies, amnesty for illegals, and is 'committed to showing all Americans what structural racism is.'" *Id.* As with Plaintiffs Urban League and Housing Action Illinois, the White House identified the organization's ideology, political positions and public advocacy in explaining why it was eliminating CHC funding.

The purported speech and advocacy that the Administration identified as objectionable occurred outside the CHC program, was unrelated to the grantees' performance of the housing counseling services funded by that program, and was neither paid for nor otherwise supported by CHC funds. The three organizations singled out by the OMB statement expressed their views independently, in their own capacities, through their advocacy on matters of public concern. Their positions on immigration enforcement, foreign policy, healthcare, housing rights, and racial justice were not part of the counseling and education that HUD funded them to provide. The Administration's stated objections thus concern those organizations' independent expression beyond the federally funded program. Similarly, the Administration's sweeping characterization of grant participants as "radical groups" with "DEI-centric discriminatory agendas" that "Peddle DEI and Discriminate Based on Race" bears no connection to the recipients' performance under, or compliance with, the CHC program.

## IV. Defendants' Actions Harm Plaintiffs

Absent relief, Defendants' actions will imminently harm Plaintiffs. Plaintiffs rely on HUD's CHC funding to sustain their housing counseling programs, serve low- and moderate-

income communities, and carry out their organizational missions. *See, e.g.,* Richardson Decl. ¶ 7; Young Decl. ¶ 5; Berger Decl. ¶¶ 6-7; Holmes Decl. ¶¶ 6-7; Graves Decl. ¶ 7-9; Gunter Decl. ¶ 7-8; Kidd Decl. ¶ 5; Agnani Decl. ¶ 7. They invested substantial time and resources competing for that funding, developed budgets and program plans in reliance on anticipated awards, and maintained the staffing and capacity needed to provide HUD-supported services. See, e.g., Agnani Decl. ¶¶ 6-10, 12; Berger Decl. ¶¶ 6-8; Graves Decl. ¶¶ 6-10; Gunter Decl. ¶¶ 6-9; Holmes Decl. ¶¶ 5, 8-14; Kidd Decl. ¶¶ 7-11, 12; Richardson Decl. ¶¶ 24-28; Young Decl. ¶¶ 5-8, 12. Defendants' attempted rescission of critical CHC funds would deprive Plaintiffs of expected funding, cause imminent reductions in services and personnel, and disrupt longstanding relationships with clients, communities, and partner organizations. *See, e.g.*, Richardson Decl. ¶ 15; Young Decl. ¶ 14; Berger Decl. ¶ 19; Graves Decl. ¶¶ 18-24; Gunter Decl. ¶¶ 14, 17. These harms undermine Plaintiffs' operations and their ability to provide critical housing counseling services.

The rescission also threatens to chill Plaintiffs' independent advocacy. Many Plaintiffs have publicly criticized or sued the Administration over its policies, including policies concerning racial equity, DEI, LGBTQ+ protections, and federal funding. *See* Kidd Decl. ¶ 20, Gunter Decl. ¶ 21, Agnani Decl. ¶ 33, Young Decl. ¶ 21, Holmes Decl. ¶ 27, Young Decl. ¶ 21. Berger Decl. ¶ 20; *see also Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971, at *1 (D. Md. July 7, 2025); *Nat'l Urban League v. Trump, 783 F. Supp. 3d 61* (D.D.C. 2025). Plaintiffs expect to continue seeking federal funding but reasonably fear that continued criticism will jeopardize their grants. *See, e.g,*, Richardson Decl. ¶ 63; Young Decl. ¶ 22; Berger Decl. ¶ 21; Holmes Decl. ¶ 28; Graves Decl. ¶ 24; Gunter Decl. ¶ 14; Kidd Decl. ¶ 21; Agnani Decl. ¶ 34. By invoking grantees' disfavored viewpoints and advocacy as grounds for eliminating CHC funding, the

Administration has threatened both Plaintiffs' ability to serve their communities and their freedom to speak on matters of public concern.

## LEGAL STANDARD

As with a preliminary injunction, a party seeking a TRO must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

#### A. Defendants' Actions Violate the First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. Accordingly, the government may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The government may not "use [its] power . . . to punish or suppress disfavored expression." *Id.* at 188.

Key here, the First Amendment prohibits government from discriminating or retaliating against "perceived" viewpoints and speech, regardless of whether the government's perception is accurate. *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270 (2016). It is the government's "motive" that accomplishes the constitutional violation and dangerously chills future speech. *Id.* at 274; *see also Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.6 (D.D.C.

2025) (explaining, in finding First Amendment violation, that "[w]hat matters is the administration's motive, whether resting on fact or falsehood.").

These fundamental principles apply with full force in the context of government funding. The Supreme Court "has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). In awarding funding, it remains "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say'." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).

Here, Defendants' statements about the rescission of the funding make clear that Defendants are refusing to spend the CHC funds, and attempting to permanently rescind them, because Defendants disfavor the recipients' perceived viewpoints and prior protected speech. The First Amendment does not permit such action.

**1. Defendants' Refusal to Obligate CHC Funds Reflects Viewpoint Discrimination**

OMB's September 25, 2026, explanation of the pocket rescission details very clearly that CHC funding is being rescinded because of the viewpoints of the recipients. OMB alleges that "[t]his HUD programs [sic] funds NGOs that ostensibly provide housing counseling, but the program has not shown reduced delinquencies for counseled homebuyers and instead focuses on grantees with DEI-centric discriminatory agendas."[8] OMB Statement. It describes CHC recipients

---

[8] Contrary to this allegation, there is strong evidence that housing counseling reduced delinquencies for counseled homebuyers. One report found that counseled homeowners "were 2.83 times more likely to receive a loan modification, and 70% less likely to redefault on a

as "radical groups" and complains about the speech of several purported "left" or "far left" CHC recipients in particular. *Id.* OMB uses Plaintiff National Urban League as an example because it "calls for the defunding of DHS and ICE under the Trump Administration, condemns President Trump for bringing Venezuelan dictator Nicolas Maduro to justice, and advocates for healthcare for illegal immigrants." *Id.* Plaintiff Housing Action Illinois' offenses are "believ[ing] 'housing is a human right,' and being committed to 'advancing equitable community development and affirmatively furthering racial justice.'" *Id.* UnidosUS draws the Administration's ire because it "supports sanctuary city policies, amnesty for illegals, and is 'committed to showing all Americans what structural racism is.'" *Id.*

Rescinding government funding because the government does not approve of funding recipients' private speech is textbook viewpoint discrimination. "[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 550 (1983)). And this case does not involve the government choosing not to subsidize particular speech. Defendants are rescinding the funding and program because they disfavor the perceived speech and ideologies of the organizations as organizations, as reflected in their mission statements and speech made wholly outside the context of the CHC program. The Supreme Court has made clear that where the government does more than "specify the activities [it] wants to subsidize," and instead seeks "to regulate speech outside the contours of the program itself," that violates the First Amendment. *Open Soc'y*, 570 U.S. at

---

modified loan." Housing Counseling Works – Sustainable Homeownership (Dec. 2014) at 1, https://files.hudexchange.info/resources/documents/Housing-Counseling-Works-%20Sustainable-Homeownership.pdf (last viewed Sept. 30, 2026). In a review of ten prior studies, "[m]ost studies have found that pre-purchase counseling leads to positive results, reducing delinquency anywhere from 19 to 50 percent." *Id.* at 2.

218; see *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 155 (D.D.C. 2025) (finding First Amendment violation where Executive Order "effectively bar[red] federal contractors' association with WilmerHale even outside the scope of their federal contracts"); *Rhode Island Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 195 (D.R.I. 2025); *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 983 (N.D. Ill. 2025).

This is not a situation like that presented in *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), where recipients of family planning funds under Title X of the Public Health Service Act brought a First Amendment challenge to the Department of Health and Human Services regulations which prohibit Title X projects from engaging in abortion counseling, referral, and activities advocating abortion as a method of family planning. *Id.* at 178– 81. There the Court held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." In holding that the challenged regulations do not violate the First Amendment, the Court noted that "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* at 193.

But here, the speech or activity at issue took place wholly outside the housing counseling program. It is not a matter of the government choosing to fund one activity over another. Further, even if it were, there is no plausible argument that the government's behavior is "based on a permissible construction of the statute and . . . not inconsistent with congressional intent." *See id.* at 188. Congress funded the CHC program and the statute makes such funding mandatory, providing that the "Secretary *shall* make financial assistance available . . . to HUD-approved housing counseling agencies and State housing finance agencies." 12 U.S.C. § 1701x(a)(4)

(emphasis added). In FY 2024, Congress appropriated $57.5 million "[f]or contracts, grants, and other assistance excluding loans" under the Housing Counseling Program, with the funds to remain available to obligate until September 30, 2025. 2024 Appropriations Act. On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds that were appropriated to HUD in the 2024 Appropriations Act, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4 §§ 1101(a)(12), 1101(b)–1108, 139 Stat. 9, 10-12 (2025).

Congress rejected the President's budget proposal for Fiscal Year 2026, which proposed eliminating all funding to the Housing Counseling Program. Technical Supplement to the 2026 Budget: Appendix at 478. And even after Congress rejected his attempt to eliminate CHC funding, the President unilaterally rescinded that congressionally approved and appropriated funding with the pocket rescission. This conflicts with the Consolidated Appropriations Act of 2026, to which Congress enacted a rider prohibiting the Executive Branch from unilaterally cutting funding for programs for which they had proposed cutting funding in any of the President's budget proposals, unless Congress actually enacted a rescission of the funds. 2026 Appropriations Act. Clearly, the rescission was not consistent with Congressional intent.

Unlike *Rust*, here we have "the case of a general law singling out . . . disfavored group[s] on the basis of speech content." See id. at 194. As a court in this district recently made clear, "[t]he Court has never . . . upheld executive action targeting specific speakers on viewpoint-based grounds for exclusion from programs funding First Amendment activities that Congress has already chosen to subsidize and for which those speakers are otherwise eligible." *Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 89–90 (D.D.C. 2026). The government action here thwarts congressional intent.

### 2. Defendants separately violated the First Amendment by retaliating against Plaintiffs for protected speech and petitioning activity.

To prevail on their First Amendment retaliation claim, Plaintiffs must establish: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Defendants] took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) there exists a causal link between the exercise of [their] First Amendment rights and the adverse action taken against [them]." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). And for purposes of the first element, as mentioned, what matters is whether the government perceived the plaintiff to have engaged in constitutionally protected speech, regardless of whether that is correct. *Heffernan*, 578 U.S. at 270–74.

Plaintiffs readily satisfy each requirement and are therefore likely to succeed on the merits of this claim.

#### a. Plaintiffs engaged in constitutionally protected activity

Plaintiffs readily satisfy the first element. Each plaintiff has engaged in protected conduct, including public advocacy, expressive association, petitioning, and litigation on topics of public concern—including issues of economic justice, fair housing, discrimination, diversity, equity, inclusion, and accessibility. These activities involve Plaintiffs' publicly-stated missions, policy positions, advocacy for historically underserved communities, and criticism of government policies. *See* Compl. ¶¶ 19-28; Richardson Decl. ¶¶ 15, 17-20; Young Decl. ¶ 5; Gunter Decl. ¶¶ 5, 21; Berger Decl. ¶¶ 5, 20; Holmes Decl. ¶¶ 5-6, 27; Agnani Decl. ¶¶ 2, 5, 32-33; Kidd Decl. ¶¶ 5, 20; Graves Decl. ¶¶ 5, 7. That expression is speech of public concern, which lies "at the heart of the First Amendment's protection" and "occupies the highest rung of the hierarchy of First

Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 758-59 (1985) and *Connick v. Myers,* 461 U.S. 138, 145 (1983) (internal quotation marks omitted)).

And Defendants certainly perceived CHC program recipients as all having engaged in protected speech. OMB characterized "grantees" of the CHC program as "radical groups" with "DEI-centric discriminatory agendas" that "peddle DEI." OMB Statement. That alone confirms that the activity Defendants regard as objectionable concerns Plaintiffs' perceived values, advocacy, and viewpoints—their protected conduct.

Urban League provides the clearest example of constitutionally protected activity that Defendants targeted. Its mission is to elevate the standard of living for Black Americans and other historically underserved people and urban communities through economic empowerment. Compl. ¶ 19. It advances that mission by, among other activities, engaging in housing counseling and other federally supported programs, and it is expressly committed to DEI principles *Id.* Urban League has repeatedly criticized and opposed Trump-administration policies: it convened a "Demand Diversity" roundtable in response to anticipated efforts to reverse affirmative action and DEI policies;[9] issued a report titled *State of Emergency: Democracy, Civil Rights, and Progress Under Attack,* which criticized the Administration for undermining civil rights, equal education, fair housing, healthcare, and the democratic process[10]; publicly condemned the administration's first

---

[9] *Demand Diversity*, Nat'l Urban League, https://nul.org/demand-diversity (last visited Sept. 30, 2026).

[10] Nat'l Urban League, *State of Emergency: Democracy, Civil Rights, and Progress Under Attack*, State of Black Am. Exec. Summary 3 (2025), https://78ab0743.flowpaper.com/NULSOBAExecutiveSummary2025web1/#page=1 (last visited Sept. 30, 2026).

100 days as "an unrelenting assault" on civil rights, economic justice, and the rule of law[11]; and sued to challenge executive orders targeting DEIA programs.[12] Those activities of public advocacy, criticism of government policy, and litigation are at the core of the First Amendment. OMB specifically identified Urban League as an example of an objectionable CHC recipient based on its alleged positions concerning DHS and ICE, Venezuela, and health care for undocumented immigrants—highlighting positions on these matters that the Urban League "calls for," "condemns," and "advocates." OMB Statement. These are quintessential matters of public concern that are distinct from Urban League's house counseling services or use of CHC funds.

Defendants similarly targeted Plaintiff Housing Action Illinois by name based on its core protected speech. OMB literally quoted alleged statements Housing Action Illinois made as a basis for rescinding program funding, stating that the organization "is a radical left NGO that believes 'housing is a human right,' and is committed to 'advancing equitable community development and affirmatively furthering racial justice.'" OMB Statement.

NCHC similarly engages in the type of protected activity Defendants publicly ridiculed. NCHC's mission is to "lead a movement to ensure every North Carolinian has a home in which to live with dignity and opportunity." Compl. ¶ 21. It advocates for race-equitable housing access and efforts to remedy historic racial exclusion[13], and it works to prevent displacement in historically Black communities.[14] It has publicly criticized the Administration's budget proposals,

---

[11] Marc H. Morial, *100 Days of Chaos Meets 100 Days of Resistance*, Nat'l Urban League (Apr. 27, 2025), https://nul.org/news/100-days-of-chaos-meets-100-days-resistance (last visited Sept. 30, 2026)
[12] *Nat'l Urban League v. Trump*, No. 1:25-cv-00471 (D.D.C. filed Feb. 19, 2025).
[13] *2025–2026 Policy Agenda*, N.C. Hous. Coal., https://nchousing.org/policy-agenda-2025-2026/ (last visited Sept. 30, 2026).
[14] *Community Justice Collaborative*, N.C. Hous. Coal., https://nchousing.org/community-justice-collaborative/ (last visited Sept. 30, 2026).

opposed various actions by HUD that make housing less accessible, and condemned the Administration's messaging that blames unaffordable housing on immigration. Gunter Decl. ¶ 21. NCHC also sued the Trump administration as part of a nationwide coalition challenging the dismantling of AmeriCorps; and submitted evidence in litigation challenging the implementation of executive orders targeting DEI programs. *See Elev8 Balt.*, No. 1:25-cv-01458 (D. Md., May 5, 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 8:26-cv-1532 (D. Md. filed April 20, 2026). NCHC was not individually named in the White House Statement, but its public advocacy falls squarely within what the Administration disparaged as "DEI-centric."

The remaining Plaintiffs likewise engage in protected speech and association through their publicly expressed commitments to affordable, stable, and fair housing; racial and economic justice; community empowerment; anti-gentrification; and serving historically underserved communities. HAI, HCDNNJ, NJCA, FHRC, and NFDM support or provide housing counseling, foreclosure prevention, financial education, and housing stability services. Compl. ¶¶ 20, 22-23, 25, 28. National CAPACD advances community development and opposes gentrification and displacement affecting Asian American, Native Hawaiian, and Pacific Islander communities. *Id.* ¶ 24. SWFCDC works to address longstanding poverty, disinvestment, unemployment, and housing instability in Southwest Fresno. *Id.* ¶ 26. And SCC advances affordable housing, economic opportunity, and community empowerment. *Id.* ¶ 27.

**b. The CHC rescission constitutes adverse action**

Defendants' rescission of the CHC program is plainly an adverse action against Plaintiffs. Plaintiffs rely on those grants to operate their core programs, serve clients, maintain staff, and fulfill commitments to community partners and sub-grantees. The loss of that funding causes Plaintiffs to suffer concrete financial and operational harms, and it would deter an organization of

ordinary firmness in plaintiff's position from continuing to criticize the administration or advocate for policies that the administration opposes. *See infra,* 34-35 (discussion of irreparable harm).

The consequences suffered by Plaintiffs easily exceed the adverse-action threshold. Terminating funding that forces an organization to "shutter projects, lay off staff, and break commitments to partner organizations and sub-awardees" are "more than enough" to establish an adverse action. *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 53 (D.D.C. 2026).

Defendants' rescission also imposes a separate injury by announcing that organizations that criticize the administration, advance DEI-related values, or engage in programming intended to remedy racial or economic disparities risk losing federal support. Government conduct that can reasonably be understood as threatening adverse action to punish or suppress speech violates the First Amendment. *NRA v. Vullo*, 602 U.S. 175, 191 (2024). Retaliatory measures punish prior speech while serving as a "warning shot" against future speech. *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 55; *see also First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 193 (2026) (the First Amendment forbids conduct that induces a reasonable recipient to "trim its protected advocacy" because it knows it is in the government's crosshairs).

Plaintiffs have relied on federal grants and intend to seek federal support in the future to achieve their missions. *See, e.g.*, Richardson Decl. ¶ 63; Young Decl. ¶ 22; Berger Decl. ¶ 21; Holmes Decl. ¶ 22; Graves Decl. ¶ 24; Gunter Decl. ¶ 22; Kidd Decl. ¶ 21; Agnani Decl. ¶ 34. Defendants' rescission thus sends the obvious, coercive message that if Plaintiffs want to compete for future funds, they should refrain from criticizing the administration and any other activities perceived as hostile to administration priorities and values. The Urban League presently receives

grants from other federal agencies,[15] which makes that threat even more coercive. As other courts have observed, this coercion equates to dangling the sword of Damocles over Plaintiffs' heads. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting) ("[T]he value of a sword of Damocles is that it hangs—not that it drops."); *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 55-56 ("the existence of [Plaintiff's] remaining grants 'keeps the sword of Damocles hanging .... [I]f you are trying to silence a critic, you don't drop the atom bomb initially. First you do something that leaves the ... affected agency with the ability to still have something to lose.'").

**c. There is a causal link between Defendants' actions and Plaintiffs' protected activity**

The record establishes that Plaintiffs' protected activity was a motivating factor behind the rescission. Defendants targeted the CHC program, and Plaintiffs' grants within it, because of the advocacy, policy positions, and values the Administration associated with CHC recipients. Here, there is direct evidence of retaliation against Urban League and HAI, and compellingly circumstantial evidence as to the other Plaintiffs.

Defendants did not merely make isolated comments about individual organizations. They announced a program-wide rescission that expressly treated recipients of CHC funds as a disfavored ideological group. OMB characterized the CHC program as "Counseling Support for NGOs that Peddle DEI and Discriminate Based on Race." OMB Statement. It asserted that the program "focuses on grantees with DEI-centric discriminatory agendas" and described recipients as "radical groups" receiving taxpayer dollars. *Id.* Those statements provide no grant-administration rationale for rescission. They do not identify deficient performance, statutory

[15] National Urban League, Inc., USA Spending, https://www.usaspending.gov/recipient/7a668b09-5623-39ba-993f-7d9159d83dfd-P/2024 (last visited Sept. 30, 2026)

noncompliance, ineligible expenditures, or any other recipient-specific failure related to participation in the CHC program. To the contrary, they identify the recipients' perceived views, values, advocacy, and associations as the basis for the rescission.

The Administration's treatment of Urban League and HAI definitively illustrates the causal link. OMB criticized the Urban League because it allegedly favored defunding DHS and ICE, condemned the President's actions concerning Venezuela, and advocated health-care access for undocumented immigrants. Compl. ¶¶ 97–99. Each of those are policy positions on matters of public concern which have no connection to whether the Urban League properly administered housing-counseling funds, met grant deliverables, served eligible clients, or complied with governing financial requirements. OMB expressly tied its rescission to the Urban League's policies and advocacy, constituting direct evidence that its protected activity motivated the adverse action.

The same is true of HAI. The OMB Statement identified it as "a radical left NGO that believes 'housing is a human right'" and is committed to "'advancing equitable community development and affirmatively furthering racial justice.'" As with Urban League, HAI was criticized not for any deficiency regarding the CHC program but rather for its mission and values, with OMB using HAI's own words—protected First Amendment activity—as the basis for rescinding its funding.

The fact that OMB named only three organizations, two of which are Plaintiffs, does not undermine the other Plaintiffs' claims of retaliation. The Administration did not indicate that its objections to the CHC program were limited to the three example organizations. Rather, OMB painted all program participants with the same broad brush. It justified a near-total termination of the CHC program based on the premise that the entire program funds "radical" organizations with "DEI-centric" agendas. OMB Statement. Rescinding $56 million of the $57.5 million appropriated

for the program confirms that Defendants did not conduct a conventional, individualized assessment of isolated recipients. Instead, they adopted a categorical approach: all program recipients were treated as presumptively objectionable because of the advocacy and values with which the Administration associated them. Defendants interpreted participation in the program as sufficient evidence that a recipient belonged to the disfavored category of "radical" organizations advancing DEI values.

That categorical approach supports causation as to each Plaintiff. Plaintiffs do not need to show that Defendants separately denounced each grantee's specific words before imposing the same penalty on them. As mentioned, the relevant question is whether Defendants subjected Plaintiffs to adverse action because Plaintiffs actually engaged in, or Defendants perceived them to engage in, protected activity disfavored by the Administration. See *Heffernan*, 578 U.S. at 272–73. In *Heffernan*, the Supreme Court held that a public employer's adverse action based on a mistaken belief that an employee had engaged in protected political association can violate the First Amendment. The constitutional injury lies in the Government's purpose to suppress or punish what it understands to be protected expression; the Government's factual mistake does not cure its unconstitutional motive. *Id.* at 272–73.

Here, each Plaintiff—including Urban League and HAI—falls into the category of organizations that Defendants announced they were targeting. Plaintiffs publicly advocate for positions that align with the same attributes Defendants publicly chastised as "DEI-centric" to condemn the CHC recipients as a group. Plaintiffs then suffered the same fate under the same program-wide rescission. The combination of perceived common protected activity, publicly announced viewpoint-based action, and the same adverse treatment establishes a substantial likelihood that NCHC's protected activity was a motivating factor.

Defendants may contend that the rescissions reflect speech-neutral concerns about fiscal responsibility, grant administration, or statutory authority. But their contemporaneous statements say otherwise. Rather than identify factors pertaining to the grantees' program-specific conduct, the Administration branded all grantees as organizations with objectionable ideologies as the basis for why they should not receive taxpayer funds. At this stage, the sweeping rescission of virtually all CHC funds, the absence of grant-specific factors, OMB's direct condemnation of Urban League's and HAI's speech, and its categorical denunciation of all grant recipients establish a substantial likelihood that Plaintiffs' protected speech was the Administration's motivating factor in the rescission.

### B. Defendants' Anticipated Arguments Based on the ICA Are Unavailing

Because Plaintiffs need relief before the Housing Counseling Assistance funds expire on September 30, the emergency schedule will likely not afford them a meaningful opportunity to file a written reply to Defendants' opposition. Plaintiffs therefore address now the principal ICA arguments Defendants have raised in similar litigation and are likely to raise here. The ICA does not preclude Plaintiffs' equitable First Amendment claims not brought under the APA. And on the merits, even if Defendants' interpretation of the ICA were correct as a statutory matter, Defendants cannot use that purported statutory authority for constitutionally forbidden reasons. In any event, Defendants' interpretation of the ICA is patently incorrect. Congress, in seeking to stop impoundments, did not authorize the Executive Branch to unilaterally rescind money by merely proposing to Congress that it rescind previously enacted legislation.

#### 1. The ICA does not preclude Plaintiffs' First Amendment claims

Defendants will likely argue that the ICA "impliedly precludes" Plaintiffs' claims because the ICA provides for a purportedly "comprehensive" remedial scheme under which the

Comptroller General may file suit over impoundments of funds. *See* Appl. for Partial Stay at 17–24, *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 25A269 (U.S. Sept. 8, 2025). Defendants will likely argue on this basis that Plaintiffs lack a cause of action to bring suit over alleged failures to obligate funds by their statutory deadline. See *id.*

That argument would fail at the threshold for Plaintiffs' First Amendment claims. Defendants' ICA preclusion argument is specific to the APA; they argue that impoundment-related claims fall under the exception to APA review for when "statutes preclude judicial review." *Id.* at 17 (quoting 5 U.S.C. § 701(a)(1); *see also Nat'l Ctr. for Learning Disabilities v. OMB*, No. 1:26-cv-13019, ECF No. 56 at 14–15 (D. Mass. Aug. 25, 2026). But Plaintiffs do not bring their First Amendment claims under the APA. Rather, Plaintiffs bring freestanding, equitable causes of action to enjoin federal officials from violating constitutional rights. Such a cause of action "has long been recognized as the proper means for preventing [the government] from acting unconstitutionally." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Defendants' preclusion argument simply has no bearing on these equitable constitutional claims.

Indeed, Defendants' ICA preclusion argument in other cases has been one of implied preclusion. But where Plaintiffs assert constitutional claims and would have no other forum to assert those claims if precluded, the government must show that Congress clearly precluded those constitutional claims. The Supreme Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). That rule reflects the "serious constitutional question" that would arise from construing a statute to "deny any judicial forum for a colorable constitutional claim." *Id.* Here, Plaintiffs would have no forum to assert their First Amendment claims if the ICA precluded them,

and Congress did not clearly express in the ICA or elsewhere that it intended to produce this outcome.

To the contrary, Congress expressly instructed courts not to read the ICA to preclude private litigants from suing over agency failures to obligate funds. The Act provides that nothing in it "shall be construed as . . . affecting in any way the claims or defenses of any party to litigation concerning any impoundment," 2 U.S.C. § 681(3). The plain text of § 681(3) refutes any suggestion that the ICA precludes any claims challenging "any impoundment." See *Nat'l Ctr. for Learning Disabilities v. OMB*, No. 26-CV-13019-ADB, 2026 WL 2754447, at *9 (D. Mass. Sept. 17, 2026); *Glob. Health Council v. Trump*, No. CV 25-00402 (AHA), 2026 WL 2884272, at *9 (D.D.C. Sept. 25, 2026). And it leaves no doubt that Congress did not expressly preclude constitutional claims; Section 681(3) is an express preservation clause, which confirms the ICA cannot be read to silently extinguish an otherwise-viable constitutional claim.

Finally, Defendants are likely to invoke the Supreme Court's preliminary order in *Department of State v. AIDS Vaccine Advocacy Coalition*, 146 S. Ct. 19 (2025) (mem.), but that order has no bearing on Plaintiffs' constitutional cause of action. There, the plaintiffs brought APA claims alleging that the government's failure to obligate appropriations, for which the President had submitted a rescission proposal, violated the relevant appropriations laws requiring that the funds be used. The Court concluded that the Government had made a sufficient showing that the ICA precluded the plaintiffs' "suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue." *Id.* at 19 (emphasis added). That tentative conclusion was based on the government's argument regarding implied preclusion of APA claims described above. And even then, the Court expressly cautioned that its order reflected only a "preliminary view" and "should not be read as a final determination on the merits." *Id.*

Here, as mentioned, Plaintiffs allege free-standing First Amendment claims not under the APA, and thus the Supreme Court's "preliminary view" as to APA claims is inapposite. The ICA therefore provides no basis to insulate Defendants' alleged viewpoint discrimination and First Amendment retaliation claims from judicial review.

**2. The ICA does not authorize Defendants' conduct on the merits**

Defendants will also likely invoke the ICA as a defense on the merits, arguing that the ICA affirmatively authorizes them to withhold the funds at issue for 45 days after the submission of a rescission proposal, even if that period extends beyond the relevant appropriations' expiration date. *See* Appl. for Partial Stay at 24–29, *AIDS Vaccine Advoc. Coal.*, No. 25A269 (citing 2 U.S.C. § 683(b)). Under this "pocket rescission" theory, the Administration may intentionally wait until there are less than 45 days left before the funds expire—in this case, just five days before expiration—submit a rescission proposal at that point, and then simply let the funds expire unspent without Congress taking any action on the rescission proposal. In Defendant Vought's words, upon submission of a rescission proposal within this 45 days window, the money "evaporates." *Supra,* n.1.

This tortured statutory interpretation is wrong as a matter of law, as explained below, but here it does not even matter if Defendants were right as a statutory matter. The ICA cannot authorize Defendants to exercise statutory authority for a reason the First Amendment forbids. No statute may authorize the Executive Branch to engage in unconstitutional conduct. See *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). As the D.C. Circuit has explained: "An ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." *Toolasprashad v. Bureau of Prisons*, 286

F.3d 576, 585 (D.C. Cir. 2002) (cleaned up) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring), rev'd on other grounds, 523 U.S. 574 (1998)).

Here, the Constitution prohibits Defendants from using their power to discriminate or punish organizations for their protected viewpoints and speech. As previously explained, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech," even where the recipient has no entitlement to the benefit, and no matter whether a statute purports to authorize such conduct. *Open Soc'y*, 570 U.S. at 214. *Media Matters of America v. Paxton* is illustrative. There, the D.C. Circuit sustained a First Amendment retaliation challenge to an investigation and civil investigative demand, notwithstanding the Texas Attorney's General authority to use those tools to investigate and enforce legal violations. 138 F.4th at 584. Similarly, in *Toolasprashad*, the D.C. Circuit recognized that prison officials may not use their discretion to transfer prisoners in a retaliatory manner even though prisoners have no independent right to avoid a transfer. *Toolasprashad*, 286 F.3d at 585 ("Despite the fact that prisoners generally have no constitutionally-protected liberty interest in being held at, or remaining at, a given facility, therefore, the Bureau may not transfer an inmate to a new prison in retaliation for exercising his or her First Amendment rights." (internal quotations omitted)).

This Court therefore need not resolve the merits of Defendants' theory of statutory authority under the ICA. Defendants have rescinded CHC program funds because of perceived viewpoints and protected speech that the Administration disfavors. The ICA does not—and constitutionally could not—give Defendants license to act on that basis.

There is another, independent reason why Defendants' reading of the ICA does not save them in this case even if it were correct (and it is not). In Section 739 of the Consolidated Appropriations Act of 2026, Congress enacted a rider prohibiting the Executive Branch from

unilaterally cutting funding for programs for which they had proposed cutting funding in any of the President's budget proposals, unless Congress actually enacted a rescission of the funds. Congress provided: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." 2026 Appropriations Act.

Here, the President's budget for FY2026 proposed eliminating funding to the CHC program: "The Budget does not provide for the Housing Counseling program." Technical Supplement to the 2026 Budget: Appendix at 478. Section 739 of the 2026 Appropriations Act thus prohibits Defendants from reducing or eliminating funding for the program "until such proposed change is subsequently enacted in an appropriation Act." So even if the earlier-enacted ICA would have authorized Defendants to unilaterally reduce funding for the program without action from Congress, Section 739 of the 2026 Appropriations Act overrides that authority, requiring that Congress actually enact a rescission of the funds.

In all events, Defendants' interpretation of the ICA is wrong: the ICA does not authorize HUD to withhold the funds that Congress appropriated for the CHC program beyond their September 30 expiration merely because those funds are subject of a rescission proposal. As GAO confirmed just yesterday, in relation to this pocket rescission attempt, "the ICA does not allow the President to withhold budget authority through its date of expiration." Ltr. from Edda Emmanuelli Perez, Gen. Coun., *Impoundment Control Act of 1974: Review of the President's Special Message of September 25, 2026* (Sept. 29, 2026), https://www.gao.gov/assets/900/890546.pdf. "The

Constitution vests in Congress the power of the purse, and Congress did not cede this important power through the ICA." *Id* at 2.

Here, Congress has affirmatively required HUD to fund the Housing Counseling Assistance program: Section 1701x provides that the Secretary "shall make financial assistance available" to HUD-approved housing counseling agencies and State housing finance agencies. 12 U.S.C. § 1701x(a)(4)(A). Congress's appropriation of funds for the program the 2025 Continuing Resolution mandated that HUD obligate all the funds before they expire; it is black-letter law that an appropriation requires an agency to obligate all of the funds appropriated, absent an express indication to the contrary in the statutory text. *See In re Aiken Cnty*., 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (explaining that the President lacks "unilateral authority to refuse to spend" funds Congress has appropriated). And the appropriation here included unusually mandatory language, directing that the "funds shall be used" for housing counseling, program administration, and counselor training. 2024 Appropriations Act, 138 Stat. at 367; see 2025 Continuing Resolution. 139 Stat. at 10–12.

Nothing in the ICA permits Defendants to disregard those statutory commands. To the contrary, the ICA again includes an express disclaimer stating the opposite: "[n]othing contained in this Act … shall be construed as … superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." 2 U.S.C. § 681(4). Section 1701x and the Housing Counseling Assistance appropriation are precisely such provisions.

Section 683(b) does not say otherwise. It provides:

> Any amount of budget authority proposed to be rescinded or that is to be reserved as set forth in such special message shall be made available for obligation unless, within the prescribed 45-day period, the Congress has completed action on a

> rescission bill rescinding all or part of the amount proposed to be rescinded or that is to be reserved.

2 U.S.C. § 683(b) (emphasis added). The "prescribed 45-day period" comes from the ICA's definition of a "rescission bill": a bill on which Congress "completes action before the end of the first period of 45 calendar days of continuous session of the Congress after the date on which the President's message is received." 2 U.S.C. § 682(3). Thus, the "45-day period" describes the period in which Congress may use the ICA's procedures to approve the proposed rescission, if Congress wishes to utilize the ICA's special procedures. Nothing in § 683(b) says that the Executive may withhold funds past a preexisting statutory deadline simply because fewer than 45 days remain when the President submits his proposal.

Indeed, reading § 683(b) to authorize a pocket rescission would invert its text. Section 683(b) provides that the funds "shall be made available for obligation unless" Congress affirmatively enacts a rescission. 2 U.S.C. § 683(b) (emphasis added). Defendants' reading would produce the opposite rule: the funds need not be made available unless Congress affirmatively acts to prevent them from expiring. Judge Ali rejected this construction of the ICA when the government engaged in a pocket rescission last year, explaining that it "creatively rearrange[s] the text to omit" the word "unless" and thereby "imply the opposite presumption." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 2576702, at *2 (D.D.C. Sept. 5, 2025). And just last week, Judge Ali again rejected the contention that "simply proposing a rescission eliminates the defendants' obligation to spend appropriated funds." *Glob. Health Council v. Trump*, No. 1:25-cv-00402, slip op. at 25 (D.D.C. Sept. 25, 2026) at 25 (citing *AIDS Vaccine Advoc. Coal.*, 803 F. Supp. 3d at 187–89).

Reading § 683(b) to permit a unilateral rescission by the executive would also render the provision unconstitutional. Defendants' theory would transform the ICA into a replica of the Line-Item Veto Act, which the Supreme Court held violated the Presentment Clause in *Clinton v. City of New York*, 524 U.S. 417, 448 (1998). Just like Defendants' pocket-rescission theory, the Line-Item Veto Act permitted the President to unilaterally cancel appropriations simply by sending a special message to Congress of such action, and the cancellation would be effective unless Congress affirmatively stepped in and passed a disapproval bill. 524 U.S. at 437. Like the Like-Item Veto Act, Defendants' theory of the ICA would allow the President "[i]n both legal and practical effect," to unilaterally amend or rescind appropriations laws, without Congress itself changing the law. *Id.* at 438. But "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.*

The Court can therefore reject Defendants' reliance on the ICA to defend their actions on multiple grounds.

## II. Plaintiffs Face Irreparable Harm

To make a showing of irreparable harm, a movant must establish that the alleged injury is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Such a showing requires "proof indicating that the harm is certain to occur in the near future." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Plaintiffs will suffer two forms of irreparable harm absent a temporary restraining order: (1) the permanent violation of their First Amendment rights; (2) and

the lost opportunity to obtain CHC funding upon which they rely. Each injury on its own is sufficient to justify the requested relief.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]he deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely."). "[T]o obtain a preliminary injunction, a party must show that their 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" *Media Matters*, 138 F.4th at 585 (quoting *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991)).

Where government grants are terminated in retaliation for protected speech, "the First Amendment injury is concrete and ongoing." *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 247 (D.D.C. 2025). As in *American Bar Association*, which granted a preliminary injunction to halt the termination of government grants to the ABA after the ABA joined a lawsuit against the federal government and criticized the presidential administration, "this case involves actual government retaliation for speech" because Plaintiffs "regularly engage[] in protected expressive activity," and the "termination of [their] grants directly punishes that activity." *Id.*

Irreparable harm was also found and a preliminary injunction issued to halt the termination of government grants to the American Academy of Pediatrics ("AAP") after AAP engaged in protected free speech disfavored by the government. *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 61. The court noted that AAP's "First Amendment interests continue to be threatened and impaired by HHS" because it "routinely employs its members' expertise by speaking openly about matters of public interest, including views on two particular public health policy topics—gender affirming

care for children and the utility of vaccinations—that are disfavored by the current leadership of HHS." *Id.* Additionally, "HHS continues to hold a third of AAP's federal funding in ongoing grants" and "[t]his continued leverage over AAP functions to 'keep[ s] the sword of Damocles hanging' as a deterrent against future speech." *Id.* Likewise, Plaintiffs are engaging in continued protected speech that is disfavored by the government, *see* Kidd Decl. ¶ 20, Gunter Decl. ¶ 21, Agnani Decl. ¶ 33, Young Decl. ¶ 21, Holmes Decl. ¶ 27, Young Decl. ¶ 22, Berger Decl. ¶ 20, and the ongoing danger of losing federal funding is extreme, *see supra* section I(B)(2).

Further, Plaintiffs are experiencing and will continue to experience concrete financial and operational harms that are neither speculative nor minimal. Rescinding CHC grants deprives Plaintiffs of longstanding program funding for which they have competed to earn, disrupts established service networks, requires immediate staffing and operational decisions, and impairs Plaintiffs' ability to serve their target populations for whom the CHC program exists.

Plaintiffs have participated in the CHC program for years—decades, for some—as a HUD-approved counseling agency, intermediary, or subgrantee. *See, e.g.*, Richardson Decl. ¶ 22 (Urban League has participated since 2004); Young Decl. ¶ 7 (HAI has participated since 2015); Berger Decl. ¶¶ 6-7 (HCDNNJ has participated since 2014); Holmes Decl. ¶¶ 6-7 (NJCA has participated since 1995); Graves Decl. ¶ 9 (NFDM has participated since 2007); Gunter Decl. ¶ 9 (NCHC has participated since 2015); Kidd Decl. ¶ 8 (FHRC has received grant funding for 23 years); Agnani Decl. ¶ 11 (National CAPACD has participated since 2010). As a result, Plaintiffs have developed counseling programs, hired staff, and maintained partnership relationships based on their continued participation.

The rescinded funds create a significant financial burden, as CHC grants are used to pay for direct counseling, intermediary administration, training, compliance, subawards, client

education, and other services contemplated by the HUD program. For example, HAI's $1.3 million grant for FY24 represents approximately 26% of its annual budget. Young Decl. ¶¶ 7-8. NFDM's $151,875 grant for FY24 represents 23% of its funding. Graves Decl. ¶¶ 9-10.

Plaintiffs rely on the CHC funding for core operations. As a result of Defendants' rescission, Plaintiffs will be forced to cut staff, restrict hours, or leave vacant positions unfilled. *See, e.g.,* Richardson Decl. ¶ 28, 30-32; Young Decl. ¶ 14; Berger Decl. ¶ 13, 19; Graves Decl. ¶¶ 18, 22; Gunter Decl. ¶¶ 14, 17. Plaintiffs and their subgrantees will also have to reduce or eliminate programs. For example, the rescission would end the counseling program for 50% of Urban League's network providers, as they have only a single person who runs the entire program. Richardson Decl. ¶ 32. Similarly, all nine intermediaries of HCDNNJ will have to reduce or eliminate counseling programs. Berger Decl. ¶ 16. NCHC's partner agencies have already reduced counseling hours and services, diverted resources to other programs, and, in some cases, shut down housing counseling operations. Gunter Decl. ¶ 17. Up to half of HAI's subgrantees have been impacted, causing them to eliminate counseling programs, reduce staff, or cease operations entirely. Young Decl. ¶¶ 14, 17. And FHRC already discontinued most of its housing counseling programs. Kidd Decl. ¶ 13.

The rescission does not simply eliminate a line item in Plaintiffs' budget. Rather, it causes concrete financial and operational injury by preventing them from delivering counseling, education, and other housing-related services that constitute the core of their operations. *See, e.g.,* Berger Decl. ¶ 18 (defunding causes "permanent institutional erosion and irreversible economic harm" to HCDNNJ and the families it serves); Young Decl. ¶ 19 (HAI and its affiliates will suffer "significant harm"); Graves Decl. ¶ 23 (NFDM suffering a "lasting harm that a future award or favorable decision cannot fully remedy")."[L]oss of funding . . . [that] 'threaten[s] the very

existence of the movant's' operations . . . goes further than the sort of 'economic loss' that cannot usually constitute irreparable harm." *Am. Bar Ass'n*, 783 F. Supp. 3d at 247; *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025) ("Because the funding freeze threatens the lifeline that keeps countless organizations operational, Plaintiffs have met their burden of showing irreparable harm."). Obstacles that frustrate an organization's "primary mission" can constitute irreparable harm. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). This is especially true when there is a looming deadline after which "there can be no do over and no redress." *Id.* (citation omitted). This is the case here given the funding expiration on September 30, which is both imminent and irreversible.

## III. The Balance of Equities and Public Interest Favor Temporary Relief

Once a party has shown likelihood of success on the merits of at least one claim and irreparable harm, a court must assess harm to the opposing party and consider whether an injunction is in the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When the government is the opposing party, these two factors merge. *Id*. Here, the public interest and balance of equities weigh heavily in favor of granting injunctive relief.

There is a strong public interest in protecting Plaintiffs' First Amendment rights. "[T]he Constitution is the ultimate expression of the public interest,' and therefore, 'government actions in contravention of the Constitution are 'always contrary to the public interest.'" *Kelly v. Hegseth*, 820 F. Supp. 3d 1, *23-24 (D.D.C. 2026) (quoting *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020)); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). As a result, there is "always a strong public interest in the exercise of free speech rights." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Where, as here, Plaintiffs have "demonstrated a strong likelihood of First Amendment retaliation," they have "both the equities and the public interest on [their] side." *Kelly*, 820 F. Supp. 3d at *23-24. Moreover, Defendants' actions threaten to chill First Amendment expression by funding recipients even beyond this case, implicating a broader public interest in free expression. *See Am. Acad. of Pediatrics*, 816 F. Supp. 3d 27, 61–62 ("[T]hough AAP has shown no inclination to be cowed or coerced, the performative power of abruptly terminating millions of dollars of federal grant funding to a prominent organization cannot be ignored by other individuals and organizations involved in public health policy issues, with the concomitant reluctance of such participants to risk the loss of federal funding and the resultant chilling of debate."). Absent an injunction, Defendants' actions cast a "chill over the whole … profession" of housing organizations because unchecked retaliation against some "threatens retaliation against all." *Jenner*, 784 F. Supp. 3d at 115. These "are constitutional interests of great significance." *N.Y. Times v. Dep't of Def.*, No. CV 26-1690, 2026 WL 1872765, at *22 (D.D.C. June 30, 2026).

Moreover, although Plaintiffs have not moved in this filing on their separation of powers claim based on Defendants' usurpation of Congress's power of the purse, the brazenness of that intrusion on a core congressional power strongly supports providing relief in the public interest. Understood since the founding as "'the most complete and effectual weapon'" of a representative body, Congress's exclusive power over federal spending serves as "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346-1347 (D.C. Cir. 2012) (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). The Spending and Appropriations Clauses protect liberty by ensuring that "the purse is lodged in one branch, and the sword in another." 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 349 (A. Hamilton)

(Jonathan Elliot ed., 2d ed. 1836). When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton*, 524 U.S. at 451. That is the case here—in both purpose and effect, the Executive's attempted pocket rescission of CHC program funds is an assault on Congress's exclusive constitutional control over federal spending.

Conversely to Plaintiffs' and the public's injuries, Defendants will not be harmed in any way by an order compelling them to obligate the full amount appropriated in the 2025 Continuing Resolution for the CHC program and to maintain the CHC program as required under 12 U.S.C. § 1701x. The funds have already been appropriated by Congress, HUD has already run the competition to award the funds, and HUD appears ready and able to award the funds promptly. Indeed, Defendants are statutorily required to "make financial assistance available . . . to HUD-approved housing counseling agencies and State housing finance agencies." 12 U.S.C. § 1701x(a)(4).

The government has no legitimate interest in disregarding an appropriation or a statutory obligation, and it certainly has no interest in doing so to carry out First Amendment violations. As in *American Bar Association*, "while the executive branch's general interest in managing public funds carries significant weight, that interest does not outweigh the strong constitutional interests at stake here." *Am. Bar Ass'n*, 783 F. Supp. 3d at 248. The government is "never free to retaliate with terminations of grant awards to recipients engaging in protected First Amendment speech disfavored by current [government] leadership, and the public suffers no harm when [the government] is restrained from doing so." *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 63.

Even if Defendants attempt to assert harm, ultimately, they "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191

(D.D.C. 2015) (citation omitted). Nor is there any "public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. The Court should grant injunctive relief to stop Defendants' viewpoint discrimination and retaliation against Plaintiffs for exercising their First Amendment rights and Defendants' broader threat to the free exercise of those rights. Whatever policy goals Defendants may assert, they "may never triumph over the Constitution." *Assoc. Press v. Budowich*, 780 F. Supp. 3d 32, 59 (D.D.C. 2025). There is a public interest in ensuring that CHC programming can continue without interruption. "[T]he harm to the public whose [housing counseling] programs may become collateral damage to [the government's] likely retaliatory acts against [Plaintiffs], outweighs the harm suffered by [Defendants] of having to disburse funds to a disfavored speaker." *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 63–64. Preliminary relief will preserve Congress's enacted funding decision and prevent constitutional harms to Plaintiffs and the public.

## IV. The Requested Relief Is Necessary to Provide Complete Relief

The requested injunctive relief—to compel HUD to obligate all expiring CHC appropriations before they expire—is necessary to provide "complete relief" to Plaintiffs. *Trump v. CASA*, Inc. 606 U.S. 831, 851 (2025). Plaintiffs' injury is the lost "opportunity to compete for a pool of funds for which they are able and willing to compete," which the D.C. Circuit has long held constitutes a cognizable injury. *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (citing *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1014–16 (D.C. Cir. 2022). It is not possible to craft a remedy for this injury that is "complete and benefits only the named plaintiffs." *CASA*, 606 U.S. at 851 n.12.

As with the *Casa* Court's example of gerrymandered districts, there is "only one feasible option" to afford Plaintiffs complete relief: enjoin Defendants' unlawful actions eliminating the

CHC program and its funding, and require HUD to obligate the full amount of funding before it expires. *Id.* at 851–52. Anything less than that would shrink the "pool of funds" from which Plaintiffs may obtain funding, *Glob. Health Council*, 153 F.4th at 12, reducing the chances that Plaintiffs will receive an award and the size of the award if they do receive one. Such an injunction may have "the practical effect" of benefitting other nonparties, but that does not make it the kind of "universal injunction" that protects nonparties that was at issue in *CASA*.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a temporary restraining order, or in the alternative for a preliminary injunction, and order that Defendants' decision not to obligate the full amount appropriated by Congress in the FY 2025 Continuing Resolution for the HUD Comprehensive Housing Counseling program ($57.5 million) before its statutory expiration date is enjoined. Further, the Court should order that Defendants are enjoined to obligate the full amount appropriated by Congress in the FY 2025 Continuing Resolution for the CHC program ($57.5 million) to eligible CHC program grantees by September 30, 2026; Defendants are enjoined from denying or conditioning access to the funds based upon applicants' protected viewpoints, advocacy, litigation, or other First Amendment activity, and from withholding, canceling, rescinding, or allowing expiration of FY2025 CHC funds on the basis of the September 25, 2026 pocket rescission proposal. The Court should order Defendants enjoined to take all steps necessary to preserve HUD's ability to lawfully obligate the funds pending further order of the Court. Lastly, the Court should order Defendants file a status report with the Court by 5 p.m. EST and 10 p.m. Eastern Time on September 30, 2026, describing their compliance with the Court's order, and at such point as they have completed obligating all of the relevant funds.

Dated: September 30, 2026

/s/ Lindsay W. Zimliki

Lindsay W. Zimliki (D.C. Bar No. 475890)

Norman L. Eisen (D.C. Bar No. 435051)

Tianna J. Mays (D.C. Bar No. 21597)

Andrew Warren (D.C. Bar No. 503003)

Taryn Wilgus Null (D.C. Bar No. 985724)

Zsa'Queria Martin (D.C. Bar No. 90043047)

Democracy Defenders Fund

600 Pennsylvania Avenue SE #15180

Washington, D.C. 20003

lindsay@democracydefenders.org

norman@democracydefenders.org

tianna@democracydefenders.org

andrew@democracydefenders.org

taryn@democracydefenders.org

zsaqueria@democracydefenders.org

/s/ Daniel F. Jacobson

Daniel F. Jacobson (D.C. Bar No. 1016621)

Lynn D. Eisenberg (D.C. Bar No. 1017511)

Stephen K. Wirth (D.C. Bar 1034038)

Nina C. Cahill (D.C. Bar No. 1735989)

Jacobson Lawyers Group PLLC

5100 Wisconsin Ave N.W., Suite 301

Washington, D.C. 20016

dan@jacobsonlawyersgroup.com

lynn@jacobsonlawyersgroup.com

stephen@jacobsonlawyersgroup.com

nina@jacobsonlawyersgroup.com

/s/ Benjamin B. Klubes

Benjamin B. Klubes (D.C. Bar No. 428852)

Klubes Law Group

1717 K Street NW, Suite 900

Washington, D.C. 20006

bklubes@klubeslaw.com

*Counsel for Plaintiffs*