UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case 1:26-cv-03401-JMC

**DEFENDANTS' OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**INTRODUCTION** ........ **1**

**BACKGROUND** ........ **2**

**LEGAL STANDARD** ........ **5**

**ARGUMENTS** ........ **5**

I. Plaintiffs Are Unlikely to Succeed on The Merits ........ 5

II. This Court Cannot "Preserve" Funding That Congress Stated Would Expire at the End of Today. ........ 10

III. Plaintiffs Have Not Demonstrated That They Are Likely to Suffer Irreparable Harm ........ 12

IV. The Balance of Equities and Public Interest Do Not Support a Temporary Restraining Order ........ 12

**CONCLUSION** ........ **13**

Defendants, various officers and agencies of the United States Government, through undersigned counsel, respectfully oppose Plaintiffs' Motion for a Temporary Restraining Order under Federal Rule of Civil Procedure ("Rule") 65 and Local Civil Rule ("LCvR") 65.1.

Plaintiffs' motion was filed this morning. Defendants are filing this brief in advance of this Court's hearing regarding Plaintiffs' motion for a temporary restraining order, which is currently scheduled for 2:00 p.m. In light of the extremely limited time in which to prepare a response, Defendants reserve all arguments.

**INTRODUCTION**

This is an extraordinary lawsuit. Plaintiffs seek to compel the Department of Housing and Urban Development ("HUD") to obligate millions of dollars of taxpayer funds to specific entities. And they want those funds obligated today. They seek to prevent the expiration of funding that Congress specifically stated would expire at the end of Fiscal Year 2026. And they seek an injunction that would prevent the President from recommending to Congress that it rescind specified funding—a recommendation that Congress expressly authorized him to make, and a recommendation that, by operation of law, Congress has 45 days to consider. The President exercised his discretionary authority—conferred by Congress. This Court lacks jurisdiction to enjoin his discretion.

The Court should deny Plaintiffs' Motion for various reasons. Most importantly, at its core, this is a case about the communications between the President and Congress, which are proceeding according to the process that Congress itself established. Interference with those interactions would be inconsistent with separation of powers. The D.C. Circuit has already spoken on the matter: Plaintiffs, such as the ones bringing this suit, do not have a cause of action to enforce the Impoundment Control Act or compel the Executive Branch to disburse appropriated funds. *Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). Plaintiffs try to evade this fatality by, at

times, characterizing their claims as arising elsewhere, such as under the First Amendment, but regardless of how Plaintiffs try to artfully plead around it, this is a case about proposed rescissions involving the President and Congress, and the D.C. Circuit has spoken: Plaintiffs have no cause of action here. *Id.* at 16 (citing *Dalton v. Specter*, 511 U.S. 462 (1994) before noting "that statutory claims cannot be transformed into constitutional ones").

Additionally, the Court's inherent equitable powers are also insufficient to justify Plaintiffs' requested relief. "[E]equitable relief cannot violate statutes." *Goodluck v. Biden*, 104 F.4th 920, 927 (D.C. Cir. 2024). That principle dooms Plaintiffs' requested order seeking to "preserve" the funding which will expire at the end of the day, which would override Congress's decision to establish a particular obligations deadline, thereby intruding on Congress's constitutional authority over appropriations. Making matters worse, the proposed order seems to be the first step in an end run around the requirements of the Impoundment Control Act of 1974, which sets out specific and exclusive procedures for disputes over the President's failure to obligate or spend funds authorized by Congress for appropriation. 2 U.S.C. § 687. And to the extent that the Plaintiffs seek this Court to affirmatively order the obligation of hundreds of millions of taxpayer dollars, such relief—even if it were possible, which it is not, is improper in a TRO context. Plaintiffs have known about the fiscal year deadline for months, and they have no excuse for sitting on their rights.

Defendants reserve the right to assert additional arguments.

**BACKGROUND**

Under Section 106 of the Housing and Urban Development Act of 1968, the Secretary of the Department of Housing and Urban Development ("HUD") is authorized, among other things, to make grants to, or contract with, public or private organizations to provide a broad range of housing counseling services to homeowners and tenants to assist them in improving their housing conditions and in meeting the responsibilities of tenancy or homeownership. 12 U.S.C.

§ 1701x(a)(1). On September 25, 2026, in accordance with Section 1012(a) of the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 683(a), the President transmitted a special message to both Houses of Congress proposing the recission of roughly $56 million in budget authority for the Housing Counseling Program. *See* Sep. Rescissions Packages. In his message to Congress, the President explained the following:

> This proposal would rescind $56 million of the $58 million appropriated in FY 2025 for Housing Counseling. This program provides grants to non-governmental organizations (NGOs) and public entities for counseling and education to individuals on a spectrum of housing matters. Grantees have included NGOs with divisive and DEI-centric agendas that peddle discrimination based on race. Further, the program has not shown reduced delinquencies for counseled homebuyers. Enacting the rescission would eliminate unnecessary and wasteful spending.

*See* Sep. Rescissions Packages.

Plaintiffs are various organizations who receive grants from the Housing Counseling Program, and they challenge the President's "pocket rescission" as unlawful. Compl. ¶¶ 1-13, ECF 1. They advance ten claims "under the First Amendment and the Administrative Procedure Act, as well as the applicable appropriations laws." *Id.* ¶¶ 13, 113-85. They state that they "seek declaratory and injunctive relief, vacatur of the unlawful rescission, an order requiring Defendants to administer the [Housing Counseling Program] in accordance with law, vacatur of unlawful funding restrictions and post-award conditions, and relief prohibiting Defendants from withholding or terminating appropriated funds based on Plaintiffs' protected speech, advocacy, association, or viewpoint." *Id.* They continue if the Court does not grant their Motion, then they will suffer irreparable harms to include "(1) the permanent violation of their First Amendment rights; (2) and the lost opportunity to obtain CHC funding upon which they rely." Pls.' Mot. at 40-41, ECF 5-1.

The Court should deny Plaintiffs' Motion for various reasons. Most importantly, at its core, this is a case about the communications between the President and Congress, which are proceeding

according to the process that Congress itself established. Interference with those interactions would be inconsistent with separation of powers. The D.C. Circuit has already spoken on the matter: Plaintiffs, such as the ones bringing this suit, do not have a cause of action to enforce the Impoundment Control Act or compel the Executive Branch to disburse appropriated funds. *Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). Plaintiffs try to evade this fatality by, at times, characterizing their claims as arising elsewhere, such as under the First Amendment, but regardless of how Plaintiffs try to artfully plead around it, this is a case about proposed rescissions involving the President and Congress, and the D.C. Circuit has spoken: Plaintiffs have no cause of action here. *Id.* at 16 (citing *Dalton v. Specter*, 511 U.S. 462 (1994) before noting "that statutory claims cannot be transformed into constitutional ones").

Additionally, the Court's inherent equitable powers are also insufficient to justify Plaintiffs' requested relief. "[E]quitable relief cannot violate statutes." *Goodluck v. Biden*, 104 F.4th 920, 927 (D.C. Cir. 2024). That principle dooms Plaintiffs' requested order seeking to "preserve" the funding which will expire at the end of the day, which would override Congress's decision to establish a particular obligations deadline, thereby intruding on Congress's constitutional authority over appropriations. Making matters worse, the proposed order seems to be the first step in an end run around the requirements of the Impoundment Control Act of 1974, which sets out specific and exclusive procedures for disputes over the President's failure to obligate or spend funds authorized by Congress for appropriation. 2 U.S.C. § 687. And to the extent that the Plaintiffs seek this Court to affirmatively order the obligation of millions of taxpayer dollars, such relief—even if it were possible, which it is not, is improper in a TRO context. Plaintiffs have known about the fiscal year deadline for months, and they have no excuse for sitting on their rights.

Defendants reserve the right to assert additional arguments.

## LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) (quoting *Postal Police Off. Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020)). As with a preliminary injunction, a party seeking a temporary restraining order must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). A court also considers the "underlying purpose" of a TRO—"preserving the status quo and preventing irreparable harm" until it has an opportunity to rule on the merits. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011) ("The court may issue a temporary restraining order ('TRO') when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held."); *Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the context of the limited purpose of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure preservation of the status quo.").

## ARGUMENTS

### I. <u>Plaintiffs Are Unlikely to Succeed on The Merits</u>

The Impoundment Control Act provides a process where the President may propose recissions of funding to the Congress. The ICA is not enforceable by private plaintiffs, as the D.C. Circuit held last year. *Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). A plaintiff may

not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). By providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* Congress may "preclude[] all judicial review" or may instead limit judicial review to a particular channel or a type of case. *Id.*

For instance, Congress may impliedly preclude some parties from seeking APA review by establishing a "complex and delicate" scheme that provides for judicial review only by others. *Id.* at 347-48. That was true in *Block* itself, where the Supreme Court held that Congress had precluded an APA action brought by consumers seeking judicial review of milk market orders issued by the Secretary of Agriculture. *Id.* at 341. The relevant statute provided a mechanism for dairy handlers to seek judicial review after administrative exhaustion, and allowed for "[h]andlers and producers—but not consumers" to "participate in the adoption and retention of market orders." *Id.* at 346. By omitting consumers, Congress intended to foreclose them from seeking judicial review of market orders. *Id.* at 347. Allowing otherwise would "effectively nullify" the administrative exhaustion that Congress had expressly required. *Id.* at 348.

The ICA's political-branch procedures and specific judicial-review mechanism preclude review of Plaintiffs' claims in an even more straightforward manner: only the Comptroller General may bring claims that the Executive Branch engaged in unlawful impoundments by failing to obligate the funds at issue. 2 U.S.C. § 687. As the D.C. Circuit recognized, whenever the President wishes to rescind or delay any budget obligations for any appropriations that fall within the ICA's scope is subject to its "complex scheme of notification," potential "congressional action," and "suit

by a specified legislative branch official" after notice to Congress. *Glob. Health Council v. Trump*, 153 F.4th 1, 18 (D.C. Cir. 2025). The President must notify Congress when he proposes to defer or rescind the appropriated funds in a "special message" that meets particular statutory requirements. 2 U.S.C. §§ 683(a), 684(a). Congress then determines how to respond: discussion and negotiation between the political branches can ensue; Congress can disapprove the rescission or deferral; it can vote to rescind some parts of the package but not others; it can legislate further; and it can decline to respond. *See* 2 U.S.C. § 688.

The ICA expressly permits judicial enforcement only at the end of that process and only by the Comptroller General. 2 U.S.C. § 687. Congress contemplated that those suits would be capacious: they cover any instance in which, "under this Act, budget authority is required to be made available for obligation and such budget authority is not made available for obligation," and it specifically chose to limit the venue to the U.S. District Court for the District of Columbia and "expressly empowered" the court to enter "any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation." *Id.* The ICA also requires such suits may happen only 25 in-session days after the Comptroller General provides Congress with a statement explaining the "circumstances giving rise to the action contemplated," allowing Congress the opportunity to avoid litigation. *Id.*

This statutory scheme preserves the political branches' accountability for enacting and implementing the appropriations laws and accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons—some of which may implicate the Executive's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States*, 809

F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government"). In keeping with the long history of the political branches resolving appropriations disputes, the ICA's procedures ensure that the political branches—not courts or private parties—control disputes over the President's decisions relating to the obligation and spending of funds appropriated by Congress.

"[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" through the APA "at any time and without notice to the Congress of the alleged violation." *GHC*, 153 F.4th at 19. That reticulated scheme of give-and-take between the political branches and congressional notification before suit necessarily forecloses private parties from seeking judicial review, supplanting interbranch negotiations, and leapfrogging the Comptroller General. *See Block*, 467 U.S. at 347-48. Any disputes between the President and Congress are to be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive," *Trump* v. *Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (citation omitted)—not through private suits by potential downstream beneficiaries of appropriations. Plaintiffs' suit to force Defendants to obligate all funds—especially when Plaintiffs seek to force the obligation of millions of dollars—would "severely disrupt" the ICA's "complex and delicate administrative scheme." *Block*, 467 U.S. at 348. Were it otherwise, private litigants could circumvent the ICA as to virtually any appropriations, claiming that the underlying appropriations statutes require faster or different obligations regardless of whether the political branches are poised to resolve those same disputes via the ICA's procedures. Accordingly, Plaintiffs' claims must be dismissed.

The ICA's disclaimer—that nothing in it "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment," 2 U.S.C. § 681(3)—does not change the result. As the D.C. Circuit recognized, that language "disclaims any effect on the claims or defenses of any party *that may bring litigation*" and "also meant that a case then-pending before the Supreme Court at the time that the ICA became law was not moot." *GHC*, 153 F.4th at 19. The Supreme Court recognized the latter effect of that provision in holding that the ICA did not moot a suit concerning the allotment of certain appropriated funds that was pending at the time the ICA was enacted. *See Train v. City of New York*, 420 U.S. 35, 41 n.8 (1975). Nothing about that provision overcomes the plain implication of the ICA's structure as precluding private parties to interfere in this process. Nor would precluding Plaintiffs' claims here mean that *all* private suits brought to enforce appropriations statutes are precluded.

Relatedly, Plaintiffs cannot state a claim for their challenge concerning the appropriations statutes because Plaintiffs do not fall within the zone of interest of those statutes. To invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991). That limitation reflects the common-sense intuition that Congress does not extend causes of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). And when a plaintiff attempts to use the APA to challenge

the government's compliance with a statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Plaintiffs cannot do so here. The appropriation statutes are directed at regulating the relationship between Congress and the Executive Branch; and Plaintiffs' interest are akin to ordinary taxpayers.

## II. This Court Cannot "Preserve" Funding That Congress Stated Would Expire at the End of Today.

The Court's equitable powers do not authorize this Court to hold the relevant funds available or suspend the obligation deadline. The D.C. Circuit has explained that older cases holding to the contrary "were decided during the 'ancien regime' when courts took a much more freewheeling approach to the law of remedies" than that which is allowed under current Supreme Court precedents. *Goodluck*, 104 F.4th at 929. Today, it is clear that courts in equity may not "override clear statutory limits"—such as an appropriations deadline—"without some other statutory authority." *Id.*; *see United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation."); *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999). Indeed, the Supreme Court has already held in the context of appropriations disputes that courts in equity "cannot grant . . . a money remedy that Congress has not authorized." *OPM v. Richmond*, 496 U.S. 414, 426 (1990) (citing *INS v. Pangilinan*, 486 U.S. 875, 883 (1988)). The period of availability is expressly written into the statute and is as legally binding as the amount appropriated and the purpose of the appropriation.

Here, Congress has determined that the appropriations at issue should expire at the end of the fiscal year—a legitimate exercise of its constitutional authority over appropriations. Overriding that decision would not only exceed the Court's equitable authority, it would also conflict with the

Appropriations Clause, which prohibits drawing money out of the Treasury that has not been appropriated by an Act of Congress. *Id.* at 428 (discussing how equitable remedies could effectively "render the Appropriations Clause a nullity"). That concern is especially heightened in a case like this one, which involves an annual appropriation and where a suspended obligations deadline could have spillover effects for future appropriated funds. An extended period for funds would create additional funding for the next fiscal year, exceeding and overriding what Congress intended.

Plaintiffs' proposed relief further conflicts with Congress's judgment because it appears to be the first step in an end-run around the exclusive procedures of the Impoundment Control Act of 1974 ("ICA"). The ICA specifies various procedures for the President to rescind funds, and it provides a specific enforcement mechanism at the end of that process in the form of a suit by a Comptroller General. 2 U.S.C. § 687; *cf. Dep't of State v. AIDS Vaccine Advocacy Coal.*, 146 S. Ct. 19 (2025). These procedures ensure that the political branches—not courts or private parties—remain in control of disputes over the President's failure to obligate or spend funds authorized by Congress for appropriation. If a dispute arises over the alleged withholding of funds, such dispute must be channeled through the procedures of the ICA. This Court should not enjoin the funds in order to facilitate relief that Congress has not authorized Plaintiffs to seek.

Lastly, it bears mentioning if the Court were to order the relief that Plaintiffs seek, i.e., and injunction to "obligate the full amount appropriated by Congress in the 2025 Continuing Resolution for the CHC program ($57.5 million) to eligible CHC program grantees," it would not be possible for Defendants to do so by the end of the day. As Plaintiffs know from their own litigation positions in other cases, issuing NOFOs, maintaining adequate application periods,

conducting full merit reviews, and obtaining internal approvals cannot be accomplished within such abbreviated timelines.

## III. Plaintiffs Have Not Demonstrated That They Are Likely to Suffer Irreparable Harm

The D.C. Circuit has set a "high standard for irreparable injury." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). First, the injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The moving party must show "the injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation modified).

Second, "the injury must be beyond remediation." *Id.* "The key word in this consideration is irreparable." *Id.* (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Clevinger*, 134 F.4th at 1234 (quoting *Va. Petroleum Jobbers*, 259 F.2d at 925). The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* Here, Plaintiffs have failed to satisfy this high burden.

## IV. The Balance of Equities and Public Interest Do Not Support a Temporary Restraining Order

When the government is an opposing party, the third and fourth factors merge "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors do not favor Plaintiff. Congress specified the procedures for how

the President may propose the rescission of funds, and Congress specified the timeline for when funds expired. That Plaintiffs do not like the timing that Congress authorized does not change the results.

## CONCLUSION

The Court should deny Plaintiffs' Motion for the reasons above.

Date: September 30, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director

JOSEPH BORSON
Assistant Branch Director

*/s/ Sam Escher*
SAM ESCHER, Bar No. 1655538
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(771) 217-8101
sam.w.escher@usdoj.gov

*Attorneys for Defendants*