UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL URBAN LEAGUE, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case 1:26-cv-03401-JMC

**DEFENDANTS' AMENDED OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**INTRODUCTION** ..... **1**

**LEGAL STANDARD** ..... **4**

**ARGUMENTS** ..... **5**

I. Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Claims ..... 5

II. Plaintiffs' Claims Are Foreclosed by The Impoundment Control Act ..... 12

III. Section 1502(b) Does Not Authorize this Court to Suspend the Appropriations Deadline, and the Court Cannot Use Its Equitable Authority to Do So ..... 14

IV. Plaintiffs Have Not Demonstrated That They Are Likely to Suffer Irreparable Harm ..... 17

V. The Balance of Equities and Public Interest Do Not Support a Temporary Restraining Order or a Preliminary Injunction ..... 20

**CONCLUSION** ..... **22**

# TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 6, 7, 9

*Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*,
103 F.4th 765 (11th Cir. 2024) ........ 11

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
804 F. Supp. 3d 45 (D.D.C. 2025) ........ 20

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........ 13

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........ 5, 17, 18

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) ........ 5, 17, 18

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........ 16, 21

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025) ........ 2, 13

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012) ........ 12

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 1, 13, 18, 20

*Goodluck v. Biden*,
104 F.4th 920 (D.C. Cir. 2024) ........ 14, 16

*Grove City Coll. v. Bell*,
687 F.2d 684 (3d Cir. 1982) ........ 11

*Hartman v. Moore*,
547 U.S. 250 (2006) ........ 10

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........ 2, 6

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ........ 16

*Nat'l Urb. League v. Trump*,
783 F. Supp. 3d 61 (D.D.C. 2025) ....................5, 6, 8, 11

*Nieves v. Bartlett*,
587 U.S. 391 (2019).................... 10

*Nken v. Holder*,
556 U.S. 418 (2009).................... 20

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016).................... 20

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015).................... 5

*Regan v. Tax'n with Representation of Wash.*,
461 U.S. 540 (1983).................... 5

*Rust v. Sullivan*,
500 U.S. 173 (1991).................... passim

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011).................... 5

*Trump v. Hawaii*,
585 U.S. 667 (2018).................... 10

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003).................... 7

*United States v. Fausto*,
484 U.S. 439 (1988).................... 13

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958).................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................... 4

*Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985).................... 17, 18

**STATUTES**

12 U.S.C. § 1701x.................... 3

2 U.S.C. § 683.................... 1, 3, 12

28 U.S.C. § 1346.................... 16

28 U.S.C. § 1491 ........ 16

31 U.S.C. § 1502 ........ 14, 15

31 U.S.C. § 1553 ........ 15

**REGULATIONS**

24 C.F.R. § 214.311 ........ 16, 18

Defendants, various officers and agencies of the United States Government, through undersigned counsel, respectfully oppose Plaintiffs' Motion for a Preliminary Injunction ("Motion"), ECF 5, under Federal Rule of Civil Procedure ("Rule") 65 and Local Civil Rule ("LCvR") 65.1.

## INTRODUCTION

Congress has explicitly authorized the President to propose the rescission of previously appropriated funds. On September 25, 2026, in accordance with Section 1012(a) of the Congressional Budget and Impoundment Control Act of 1974 ("ICA"), 2 U.S.C. § 683(a), the President transmitted a special message to both Houses of Congress proposing the rescission of roughly $56 million in budget authority for the Comprehensive Housing Counseling ("CHC") program. *See* Proposed Rescissions (Sep. 25, 2026), ECF 17-1, 17-2. The President's proposal was based on his conclusion that the funds were being used in support of unnecessary and wasteful spending, some of which was in support of diversity, equity, and inclusion ("DEI") viewpoints that supported racial discrimination.

Plaintiffs—a collection of non-profits who wish to apply for CHC grants—have sued to try to "preserve" those funds even though the expiration date set by Congress for those funds has already passed. The only claims they rely on in their Motion for a Preliminary Injunction are that the President's message violated the First Amendment. Plaintiffs are wrong as a matter of both substance and remedy.

At the outset, the front door to Plaintiffs' challenge of the rescission messages is closed. That is so because the D.C. Circuit has already held that they lack a cause of action for several of their purported claims. *See Glob. Health Council v. Trump*, 153 F.4th 1, 13-21 (D.C. Cir. 2025) (holding grantees lacked a cause of action to pursue variously styled claims that boiled down to efforts to enforce the ICA). The Supreme Court has suggested that it agrees. *Dep't of State v. Aids*

*Vaccine Advoc. Coal.*, 146 S. Ct. 19, 19 (2025) ("The Government, at this early stage, has made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here.").

To evade these impediments, Plaintiffs press First Amendment claims in this case for purported viewpoint discrimination and for retaliation. Compl. ¶¶ 113-34, ECF 1. These First Amendment claims fail. At their heart, they are claims that the President has proposed not funding certain programs based on his assessment that the ideas those programs are supporting are not in the Nation's interest. But the Constitution permits the Government to "selectively fund a program it believes to be in the public interest, without at the same time funding an alternative program." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is not viewpoint discrimination; it is merely "choo[sing] to fund one activity to the exclusion of the other"—something the Supreme Court has long upheld for government programs. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998). The President's determinations about "unnecessary and wasteful spending" in a program that was ineffective and that he determined supported "divisive and DEI-centric agendas that peddle discrimination based on race," *see* Proposed Rescissions (Sep. 25, 2026), ECF 17-1, 17-2, are the type of policy judgments about federal funding that does not implicate, much less offend, the Constitution.

Moreover, the context of Plaintiffs' flawed First Amendment claims further undercuts them. Plaintiffs are essentially attacking the President's proposal to rescind certain funds. But the ICA supplies a carefully designed interbranch process through which such claims should play out—one that culminates in suits by the Comptroller General, not by private parties like Plaintiffs.

In all events, Plaintiffs seek an improper remedy. Congress provided that the funds at issue would expire at the stroke of midnight as September 30, 2026, turned to October 1. Although this

Court issued an order purporting to "preserve the status quo" and suspend the deadline to obligate or award those funds, Order at 5, ECF 15, that order was improper and should be dissolved. To the extent that previous cases, some decades old, indicated that Courts have equitable power to overcome congressional judgments about when funds are to expire (and under what circumstances), they are inconsistent with more modern caselaw that limits the scope of equitable remedies. Nor is there statutory authorization. There is, to be sure, a statute that allows funds to be carried over—but only when there is a "right to payment" of those funds. Here, the funds at issue have never been obligated to a potential grantee. No applicant for funds—including the Plaintiffs—has any right to the funds. And so statutory authority is absent.

Finally, Plaintiffs are not suffering irreparable harm, and the balance of equities favor Congress's judgment about the President's power to propose rescissions and the timeline for expiration of federal funds to be respected. This Court should deny Plaintiffs' Motion.

## BACKGROUND

Under Section 106 of the Housing and Urban Development Act of 1968, the Secretary of the Department of Housing and Urban Development ("HUD") is authorized, among other things, to make grants to, or contract with, public or private organizations to provide a broad range of housing counseling services to homeowners and tenants to assist them in improving their housing conditions and in meeting the responsibilities of tenancy or homeownership. 12 U.S.C. § 1701x(a)(1). On September 25, 2026, in accordance with Section 1012(a) of the ICA, 2 U.S.C. § 683(a), the President transmitted a special message to both Houses of Congress proposing the rescission of roughly $56 million in budget authority for the CHC program. *See* Proposed Rescissions (Sep. 25, 2026), ECF 17-1, 17-2. In his message to Congress, the President explained the following:

> This proposal would rescind $56 million of the $58 million appropriated in FY 2025 for Housing Counseling. This program provides grants to non-governmental organizations (NGOs) and public entities for counseling and education to individuals on a spectrum of housing matters. Grantees have included NGOs with divisive and DEI-centric agendas that peddle discrimination based on race. Further, the program has not shown reduced delinquencies for counseled homebuyers. Enacting the rescission would eliminate unnecessary and wasteful spending.

*Id.*

While Plaintiffs bring a number of claims, in their Motion they make clear that they are moving for preliminary relief related to only two First Amendment claims, one for viewpoint discrimination and another for retaliation. Compl. ¶¶ 113-34, ECF 1. On September 30, 2026, they moved for a temporary restraining order and a preliminary injunction related to the two First Amendment claims only. *See* Pls.' Mot. at 9 n.2, ECF 5-1. They asked the Court to enjoin Defendants "from withholding, canceling, rescinding, or allowing expiration of FY2025 CHC funds on the basis of the September 25, 2026" special message to Congress, and "to obligate the full amount appropriated by Congress in the 2025 Continuing Resolution for the CHC program ($57.5 million) to eligible CHC program grantees by" the end of the day. Proposed Order, ECF 5-2.

The parties appeared for a hearing on September 30, 2026. The same day, the Court issued an Order to "preserve the status quo and maintain the Court's jurisdiction pending resolution of Plaintiffs' request for preliminary relief[.]" Order at 5, ECF 15. The Court also issued a briefing schedule to allow Defendants to provide "a more fulsome response to Plaintiffs' motion." *Id.* at 5. For the reasons below, the Court should deny Plaintiffs' Motion.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The moving party bears the burden of persuasion and must demonstrate "by a clear showing" that the requested relief is warranted. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Before the Supreme Court decided *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Now, it "is questionable that the sliding scale approach remains good law." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235 (D.C. Cir. 2025). The D.C. Circuit has explained that *Winter* "can be read to require movants to establish each preliminary injunction factor independently." *Id.* Regardless, "a movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief." *Id.* at 1236. So is the failure to show a likelihood of success on the merits. *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025).

**ARGUMENTS**

**I. Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Claims**

a. The First Amendment prohibits governments from "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). But the Supreme Court has "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546 (1983) (internal quotation marks and citation omitted). That is why the Supreme Court has long held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program." *Rust*, 500 U.S. at 193. "In doing so, 'the Government

has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'" *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193). After all, "[i]t is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government, rather than save money by making their posts hereditary." *Id.* at 598 (Scalia, J., concurring in the judgment).

Put slightly differently, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Rust*, 500 U.S. at 193. Because the Government "has wide latitude to set spending priorities," it "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Finley*, 524 U.S. at 587–88. To be sure, the government cannot "leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). But within a program, a decision "to fund one activity to the exclusion of another" does "not run afoul of the First Amendment." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 99 (D.D.C. 2025)

Those principles are fatal to Plaintiffs' First Amendment claims. The President's message to Congress expressed two reasons for rescinding the appropriated funds, both of which are permissible under the First Amendment. *See* Proposed Rescissions (Sep. 25, 2026), ECF 17-1, 17-2. First, the President explained that grantees in the program have "divisive and DEI-centric agendas that peddle discrimination based on race." *Id.* "Further," the message continues, "the program has not shown reduced delinquencies for counseled homebuyers." *Id.* The President concluded that a "rescission would eliminate unnecessary and wasteful spending" in the program.

*Id.* The latter, independent reason—namely that the program had been ineffective and thus the funding for that program wasteful—plainly has nothing to do with the grantees' viewpoint. And the President's choice to rescind funds to organizations that he believes to be "peddl[ing] discrimination based on race" is exactly the type of permissible "decision not to subsidize" programs that are no longer in the public interest that the Supreme Court endorsed in *Rust*, 500 U.S. at 193. It is not viewpoint discrimination, nor is it retaliation for protected speech.

b. Plaintiffs assert that *Rust* does not foreclose their viewpoint-discrimination claim on the theory that Defendants are trying to regulate their speech outside of the CHC program. Pls.' Mot. at 21, ECF 5-1. That argument lacks merit, because the President did not "leverage funding to regulate speech outside the contours of the program itself." *All. For Open Soc'y Int'l, Inc.*, 570 U.S. at 214–15. Nothing in the President's special message to Congress seeks to control what Plaintiffs do or what messages they send with the funding they receive from *other* sources. *Cf. United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (holding statute forbidding public libraries from receiving federal assistance for Internet access unless they installed software to block obscene or pornographic images did not violate First Amendment because to "the extent that libraries wish[ed] to offer unfiltered access, they [were] free to do so without federal assistance"); *Rust*, 500 U.S. at 196 (noting that a grantee "may receive funds from a variety of sources for a variety of purposes" and "can continue to . . . engage in abortion advocacy" but it was "required to conduct those activities through programs that are separate and independent from the project that receives" federal funds).

Plaintiffs are free to use whatever funds they have obtained from elsewhere to spread whatever message they desire. In fact, the record shows that most Plaintiffs receive funding from other sources to further their missions. For example, the National Urban League declared that the

CHC program accounts for 30% of its HUD annual budget funding. Richardson Decl. ¶ 23, ECF 5-3. Its "additional funding for housing counseling comes from private sources, such as banking partners and foundations[.]" *Id.* New Jersey Citizen Action declared that only 9% of its organization budget comes from CHC funding. Holmes Decl. ¶ 13, ECF 5-4. It receives the rest from "financial institutions as well as [its] partner organization[.]" *Id.* National Foundation for Debt Management declared that only approximately 23% of its funding and revenues come from the CHC program. Graves Decl. ¶ 10, ECF 5-6. And North Carolina Housing Coalition declared that it also obtains funding through "private philanthropy, foundation grants, local government funding, and agency contracted services." Gunter Decl. ¶ 8, ECF 5-8.

But even if Plaintiffs had no funds other than taxpayer support, their claims would still fail on the merits because "the government does not abridge the right to free speech by choosing not to subsidize it[.]" *Nat'l Urb. League*, 783 F. Supp. 3d at 77. Said differently, "Plaintiffs' desire to speak about certain topics with the government's help does not mean that refusing to fund such activities denies Plaintiffs the right to engage in that protected activity." *Id.* at 100 (quoting *Rust*, 500 U.S. at 198)). Thus, while Plaintiffs may have hoped for a subsidy from the Government to spread their message, they certainly were never entitled to one, and the Government does not violate the First Amendment by not providing one. *Id.* ("Because the government is not constitutionally obligated to fund Plaintiffs' preferred speech or to contract with them for certain purposes, the decision to stop funding that speech or contracting for those ends is not an example of the government doing 'indirectly what' it 'is barred from doing directly.'").

c. Because Plaintiffs cannot point to any viewpoint discrimination or coercion on the face of the rescission proposals themselves, they focus on an OMB statement announcing the President's rescission package. Pls.' Mot. at 29-32, ECF 5-2. They observe that the statement

mentioned two of the Plaintiffs in this case specifically, and characterized them as "radical" based on, among other things, their views calling for "the defunding of DHS and ICE under the Trump Administration." Pls.' Mot. at 20-21, ECF 5-1. Plaintiffs assert that the press statement establishes that Defendants are impermissibly seeking "to regulate speech outside the contours of the program itself." Pls.' Mot. at 21, ECF 5-1 (quoting *Open Soc'y*, 570 U.S. at 218). The OMB statement does not support that argument.

The OMB statement does not "regulate" speech or place a "condition" on the receipt of CHC funds, like the condition at issue in *Open Society*. 570 U.S. at 215. Instead, the OMB statement is effectively a press release, which purported to explain to the general public what the President had done when he proposed the rescission package to the public. The statement reiterates the President's special message that the CHC "program has not shown reduced delinquencies for counseled homebuyers and instead focuses on grantees with DEI-centric discriminatory agendas." https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending. And although the statement mentions two of Plaintiffs' positions on certain issues unrelated to housing counseling, the statement did not suggest that those positions were the *reason* for the President's proposed rescission. On the contrary, the statement merely articulated to the public an incidental effect of the rescission proposal: that certain grantees that disagreed with the President's agenda on other matters could lose some amount of funding. Plaintiffs may disagree with that messaging strategy, but that does not amount to a condition on funding or an attempt to regulate speech unrelated to the CHC program. More fundamentally, Plaintiffs are challenging the *President*'s decision to rescind the funds; his explanations are wholly articulated in his message to Congress; and Plaintiffs cannot leverage an OMB press release to impugn the President's stated reasons. *Cf. Trump v. Hawaii*, 585 U.S. 667,

699-702 (2018) (diminishing various statements from the President and his advisors casting doubt on official objective of Proclamation where, among other things, Proclamation itself was "facially neutral toward religion").

c. Nor can Plaintiffs escape *Finley* by framing their challenge to the President's funding decisions as a matter of "First Amendment retaliation." Pls.' Mot. at 24, ECF 5-1. At bottom, their retaliation claim is still that Defendants violated the First Amendment by discriminating against their viewpoint. Plaintiffs' efforts to repackage a viewpoint discrimination claim as a retaliation claim based on policy disagreements would nullify the long line of Supreme Court precedent permitting the Government not to subsidize programs with which it disagrees. *See Rust*, 500 U.S. at 193.

That said, Plaintiffs' retaliation claim fails for the additional reason that they are unlikely to establish the requisite causation needed to prove First Amendment retaliation. To prove causation, it "is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (emphasis in original). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* Even if an action were "colored by some degree of bad motive" that "does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). In other words, if Defendants would have taken the same action regardless of the purportedly protected speech, then Plaintiffs do not have a claim. *Nieves*, 587 U.S. at 398; *Hartman*, 547 U.S. at 260.

Here, Plaintiffs cannot show that any purportedly protected speech caused the President's recommended rescission. The record shows that the President proposed that funding for the CHC

program be rescinded for several reasons: (1) "Grantees have included NGOs with divisive and DEI-centric agendas that peddle discrimination based on race," which is not protected speech, (2) "the program has not shown reduced delinquencies for counseled homebuyers, and thus (3) "[e]nacting the rescission would eliminate unnecessary and wasteful spending." Proposed Rescissions (Sep. 25, 2026), ECF 17-1, 17-2. Even if Plaintiffs could establish that the Defendants' actions were "colored by some degree of bad motive," the President's independent determination that the CHC program was unsuccessful, unnecessary, and wasteful establishes that he would have proposed rescinding funds for the program regardless of any of Plaintiffs' purportedly protected expression.

Additionally, Plaintiffs cannot succeed on a retaliation claim because they cannot establish that their DEI-based housing-counseling services constitute protected expression. To begin, it is not clear that all of Plaintiffs' housing-counseling services even have an expressive component that triggers the First Amendment's protections in the first place. But at the very least, Plaintiffs' DEI-based counseling services do not constitute *protected* expression. "[T]he Constitution does not provide a right to violate federal antidiscrimination law." *Nat'l Urb. League*, 783 F. Supp. 3d at 71. "[T]he Supreme Court has clearly held that the First Amendment does *not* protect the very act of discriminating on the basis of race." *Id.* at 102 (quoting *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024)). More generally, the right to speak freely provides no shield for "private individuals or institutions" that "engage in discrimination" that violates federal law. *Id.* (quoting *Grove City Coll. v. Bell*, 687 F.2d 684, 702 (3d Cir. 1982)). Plaintiffs cannot "assert an alleged first amendment right to be free of the strictures of" federal antidiscrimination law "and also claim the right to continued federal funding" and contracts. *Id.* To be sure, Plaintiffs disagree that DEI-based practices are discriminatory. *See, e.g.*, Pls.' Mot. at

Pls.' Mot. at 25-26, ECF 5-1. But "[i]f Plaintiffs worry that this administration takes a broader view of what counts as illegal discrimination, that is a concern with the interpretation of the underlying federal antidiscrimination law[.]" *Nat'l Urb. League*, 783 F. Supp. 3d at 102. Regardless, Plaintiffs do not dispute that the funded activities they have received in the past—and seek to receive in the future—implicate DEI practices that the President disagrees with.

## II. Plaintiffs' Claims Are Foreclosed by The Impoundment Control Act

The context in which Plaintiffs have raised their fatally flawed First Amendment claims is another reason to reject them. Plaintiffs' claims boil down to an argument that the President acted unlawfully in proposing to rescind certain funds that Congress had appropriated. But Congress has reserved disputes of that nature to the political branches in the ICA. As explained below, that scheme precludes Plaintiffs' request for relief from this Court.[1]

The ICA supplies a highly reticulated interbranch process for rescissions, under which the President transmits a special message to Congress about the proposed rescission, 2 U.S.C. § 683(a), and Congress then determines how to respond: Congress could disapprove the rescission or deferral; it could vote to rescind some parts of the package but not others; it could legislate further; or it could decline to respond. *See id.* § 688. Of particular importance, the ICA contemplates an express enforcement mechanism only at the end of that process, and only via suits by the Comptroller General. *Id.* § 687. Congress contemplated that those suits would be capacious: they cover any instance in which, "under this chapter, budget authority is required to be made available

[1] An argument that the plaintiff's requested relief is entirely precluded, rather than channeled to another forum, is properly understood as going to the merits rather than jurisdiction. *Compare Fausto*, 484 U.S. at 447, *with Elgin v. Dep't of the Treasury*, 567 U.S. 1, 12 (2012). Here, the government's argument is that Plaintiffs' requested relief is entirely precluded by the ICA, because that statute makes them the wrong entity to bring a suit. The Court thus may reach the merits of the First Amendment issue without first deciding the ICA-preclusion issue.

for obligation and such budget authority is not made available for obligation." *Id.* That language plainly covers Plaintiffs' suit, which asks this Court to hold that certain "budget authority" must be "made available for obligation." That judicial-review scheme—and the absence of any role for private suits like Plaintiffs'—precludes Plaintiffs' claims here. *See United States v. Fausto*, 484 U.S. 439, 447-49 (1988); *cf. Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).

At an absolute minimum, there can be no doubt that the ICA precludes any of Plaintiffs' claims tied to the ICA itself. It is unclear whether Plaintiffs are actually arguing for purposes of this preliminary injunction that they are likely to succeed on the merits of any purported claim that is tied to the ICA. On one hand, Plaintiffs made it abundantly clear in their brief that they "seek a temporary restraining order based only on their First Amendment claims of viewpoint discrimination (Count I) and retaliation (Count II)." Pls.' Mot. at 9 n.2, ECF 5-1. They echoed this position at the last hearing. On the other hand, they have included a section seemingly arguing the merits of their claims tied to the ICA which are unconnected to their First Amendment claims. *See id.* at 35-40 (arguing Defendants' have a "tortured statutory interpretation" of the ICA that is at odds with the 2026 Appropriations Act).

If Plaintiffs are, in fact, arguing, unconnected to their First Amendment claims, that Defendants acted contrary to law or ultra vires when the President proposed rescinding the budget for the CHC program, then Plaintiffs do not have a cause of action. *Glob. Health Council*, 153 F.4th at 13-21; *see Aids Vaccine Advoc. Coal.*, 146 S. Ct. at 19.

If Plaintiffs are arguing that Defendants' interpretation of the ICA is so "tortured" that it somehow supports retaliatory animus in support of their First Amendment claims, then that is wrong, too. The ICA provides that the Executive may carry out lawful impoundments subject to certain procedures and restrictions. *Glob. Health Council*, 153 F.4th at 20. When the President sent

a special message to Congress on September 25, 2026, he followed the procedures articulated by Congress in Section 1012(a) of the ICA. That Defendants were following the law cannot support an inference of retaliatory intent.

## III. Section 1502(b) Does Not Authorize this Court to Suspend the Appropriations Deadline, and the Court Cannot Use Its Equitable Authority to Do So

Even if Plaintiffs can establish a likelihood of success on their First Amendment claims, Plaintiffs' motion should still be denied because the funds Plaintiffs seek are beyond their expiration date.

This Court lacks statutory authority to suspend appropriations deadlines and to the extent that decades-old cases have held that freestanding equitable authority to suspend such deadlines exist, such cases are inconsistent with current authority and should not be applied here. Defendants understand the Court held in its September 30, 2026, Order that it had "equitable and statutory authority to suspend operation of the otherwise-applicable September 30, 2026, lapse of budget authority pending resolution of Plaintiffs' request for preliminary relief." Order at 3, ECF 15. Given the quick nature of temporary restraining order proceedings, however, Defendants were unable to fully articulate their position. For the reasons below, 31 U.S.C. § 1502(b) does not authorize a Court to suspend an appropriations deadline, and the Court cannot use its equitable authority to do so.[2]

[2] Defendants wish to clarify they are not arguing that the D.C. Circuit cases finding an equitable power exists in the appropriations context have been overruled or are not binding on this Court. *See* Order at 4, ECF 15 (citing cases). Had Defendants had more time to prepare, Defendants would have more clearly explained its position, consistent with the position it has taken before, that *Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024) does not explicitly overrule cases finding an inherent equitable authority to suspend a lapse in appropriations deadline, but its commentary suggests that those prior cases should be overruled, or at the very least, Courts should decline to exercise their equitable authority to suspend a lapse in appropriations deadline in light of current doctrine inconsistent with those earlier cases.

First, Section 1502(b) does not authorize the relief that Plaintiffs request. That provision addresses situations in which an "appropriation or fund" such as the CHC program funds must be "returned to the general fund of the Treasury at the end of a definite period." 31 U.S.C. § 1502(b). When an appropriation expires (or lapses) at the end of the period of availability—such as the end of Fiscal Year 2026 here—the balance is *not* returned to the general fund of the Treasury. *See* P.L. 97-258 § 1552(a), 96 Stat. 928 (1982) (as amended) (codified at 31 U.S.C. § 1552(a)). Rather, the balance within an appropriation account is no longer available to incur new obligations but remains available for five additional fiscal years to process transactions related to obligations properly incurred during the period of availability. 31 U.S.C. § 1553(a). In other words, it can pay debts previously incurred (i.e., if funds had previously been obligated); it is not a statutorily authorized method of preserving money that was never obligated before it expired, as here.

By comparison, Section 1502(b) thus deals with the procedure for *closing* appropriation accounts—distinct from *expiration* of an appropriation. Section 1502(b) refers to and interacts with technical account closure provisions in Sections 1552(a) and 1553(a) to ensure that the procedure of *closing* an appropriation account—distinct from an appropriation *expiring*—does not affect claims based on obligations that were properly incurred while the appropriation was available for new obligations. All this means that Section 1502(b) provides no authority to suspend the lapse of funds here.

Moreover, even if Section 1502(b) applied to the expiration of appropriations, it would not apply here for another reason. Section 1502 is concerned with "expenses" incurred and "contracts" made during the period of availability. 31 U.S.C. § 1502(a). Accordingly, Section 1502(b) applies only when a plaintiff files a suit "involving the right to an amount payable from the balance" of an appropriation. *Id.* Plaintiffs do not assert a "right to an amount payable" from the 2026 FY CHC

program funds at issue. 31 U.S.C. § 1502(b). Though Plaintiffs presumably hoped to compete for the funds and perhaps even be awarded some portion of them, Plaintiffs had no "right" to the funds in question. 24 C.F.R. § 214.311(a) ("HUD approval or program participation does not guarantee housing counseling grant funding."). Indeed, it is not clear how Plaintiffs here could claim a right to the entire balance of appropriated funds. As such, Plaintiffs cannot invoke Section 1502(b) to suspend the deadline for appropriations lapses.[3]

Second, while D.C. Circuit cases found that equitable power exists in the appropriations context, *see* Order at 4, ECF 15 (citing cases), the D.C. Circuit has subsequently explained that those cases "were decided during the '*ancien regime*' when courts took a much more freewheeling approach to the law of remedies" than that which is allowed under current Supreme Court precedents. *Goodluck*, 104 F.4th at 929. And while those cases have not been overruled, courts in equity may not "override clear statutory limits"—such as an appropriations deadline—"without some other statutory authority." *Id.* The Supreme Court has made that clear in recent decades. *See United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation."); *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999). Indeed, the Supreme Court has already held in the context of appropriations disputes that courts in equity "cannot grant . . . a money remedy that Congress has not authorized." *OPM v. Richmond*, 496 U.S. 414, 426 (1990) (citing *INS v. Pangilinan*, 486 U.S. 875, 883 (1988)). The period of availability is

[3] Relatedly, even if Plaintiffs had some "right to an amount payable," this Court would lack jurisdiction because of the Tucker Act. 28 U.S.C. §§ 1346(a)(2); 1491(a)(1); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025).

expressly written into the statute and is as legally binding as the amount appropriated and the purpose of the appropriation.

Here, Congress has determined that the appropriations at issue should expire at the end of the fiscal year—a legitimate exercise of its constitutional authority over appropriations. Overriding that decision would not only exceed the Court's equitable authority, it would also conflict with the Appropriations Clause, which prohibits drawing money out of the Treasury that has not been appropriated by an Act of Congress. *Id.* at 428 (discussing how equitable remedies could effectively "render the Appropriations Clause a nullity"). That concern is especially heightened in a case like this one, which involves an annual appropriation and where a suspended obligations deadline could have spillover effects for future appropriated funds. An extended period for funds would create additional funding for the next fiscal year, exceeding and overriding what Congress intended. If Congress determines that the Executive should have obligated the funds at issue here, it can take that into account in the next appropriation.

## IV. Plaintiffs Have Not Demonstrated That They Are Likely to Suffer Irreparable Harm

The D.C. Circuit has set a "high standard for irreparable injury." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). First, the injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The moving party must show "the injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation modified).

Second, "the injury must be beyond remediation." *Id.* "The key word in this consideration is irreparable." *Id.* (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). "Mere injuries, however substantial, in terms of money, time and energy

necessarily expended in the absence of a stay, are not enough." *Clevinger*, 134 F.4th at 1234 (quoting *Va. Petroleum Jobbers*, 259 F.2d at 925). The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.*

Here, Plaintiffs plainly fail to meet this standard. They state they will suffer two forms of irreparable harm: "(1) the permanent violation of their First Amendment rights; (2) and the lost opportunity to obtain CHC funding upon which they rely." Pls.' Mot. at 40-41, ECF 5-1. For the reasons above, Plaintiffs have failed to show that they are likely experiencing a First Amendment violation. Regarding the funding, as Plaintiffs concede in their brief, they have no right to a governmental benefit. *See* Pls.' Mot. at 20, ECF 5-1. At best, they hope for an opportunity to compete for funding, but an opportunity to compete does not guarantee that Plaintiffs will, in fact, receive funding. *See* 24 C.F.R. § 214.311(a) ("HUD approval or program participation does not guarantee housing counseling grant funding."). Funding for the CHC program, further, is "awarded competitively under Federal and HUD regulations and policies governing assistance programs[.]" *Id.* Because they cannot show that they will, in fact, receive funding, their purported harm is "theoretical" as opposed to certain, great, and actual. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Moreover, even if Plaintiffs had shown that an opportunity to compete for funds was enough, they have nonetheless still failed to meet the standard because they must show that any purported financial injury "threatens the very existence of the [their] business." *Glob. Health Council*, 153 F.4th at 21 (quoting *Wis. Gas Co.*, 758 F.2d at 674 (D.C. Cir. 1985)); *see also Clevinger*, 134 F.4th at 1235 ("Nor is [the appellants] financial injury so great as to threaten its continued existence.").

At worst, the record shows that Plaintiffs may have had to reduce certain services, *see, e.g.*, Pls.' Mot. at 18, ECF 5-1 (arguing less funds would "cause imminent reductions in services and personnel"), but as in *Global Health Council*, the "record is simply less developed about how long the grantees could financially continue without the opportunity to compete for impounded funds as opposed to the funds from existing contracts and why being denied immediate relief as to that opportunity would cause harm the grantees would not suffer anyway." *Id.* at 21. If anything, as explained above, the record shows that Plaintiffs receive funding from other sources, and from what Defendants can tell, the funding they receive from the CHC program is but a portion of their budgets:

1. National Urban League declared that the CHC program accounts for only 30% of its HUD annual budget funding. Richardson Decl. ¶ 23, ECF 5-3. Its "additional funding for housing counseling comes from private sources, such as banking partners and foundations[.]" *Id.*

2. New Jersey Citizen Action declared that only 9% of its organization budget comes from CHC funding. Holmes Decl. ¶ 13, ECF 5-4. It receives the rest from "financial institutions as well as [its] partner organization[.]" *Id.*

3. Fair Housing Resource Center declared that only approximately 5% of the CHC program accounts for its budget. Kidd Decl. ¶ 9, ECF 5-5.

4. National Foundation for Debt Management declared that only approximately 23% of its funding and revenues come from the CHC program. Graves Decl. ¶ 10, ECF 5-6.

5. Housing Action Illinois declared that only 26% of its annual budget come from the CHC program. Young Decl. ¶ 8, ECF 5-7.

6. North Carolina Housing Coalition declared that it also obtains funding through "private philanthropy, foundation grants, local government funding, and agency contracted services." Gunter Decl. ¶ 8, ECF 5-8.

7. National Coalition for Asian Pacific American Community Development ("National CAPACD") declared that the CHC program made up 6% of its operating budget in 2024 and 5% in 2025. Agani Decl. ¶ 12, ECF 5-9.

8. Housing and Community Development Network of New Jersey declared that the CHC program represented only 17.71% of all reported housing counseling revenue

> and that its subgrantees raised $1,881,924.91 in non-federal funds in support of their Housing Counseling programs in FY 2024-2025. Berger Decl. ¶ 8, ECF 5-10.

Thus, because Plaintiffs obtain funding from other sources, and the CHC funding only makes up a portion of their budgets, if anything, the record contradicts Plaintiffs claims of irreparable harm tied to "the lost opportunity to obtain CHC funding upon which they rely." Pls.' Mot. at 40-41, ECF 5-1. They clearly appear to be able to continue operating, albeit perhaps with reduced services. And because "the later opportunity to compete for additional grants could fix the harm, it would not be irreparable." *Glob. Health Council*, 153 F.4th at 21; *see also Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 71 (D.D.C. 2025) ("Plaintiffs' only demonstrated harms from their prospective APA claims can be remedied at the end of this litigation if Plaintiffs win.").

## V. The Balance of Equities and Public Interest Do Not Support a Temporary Restraining Order or a Preliminary Injunction

When the government is an opposing party, the third and fourth factors merge "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis omitted) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors do not favor Plaintiff. Simply put, the public does not have an interest in using taxpayer funds to support discriminatory practices or ineffective programs. And the public has an interest in Congress's choices about appropriation deadlines—and the appropriate mechanisms for challenging them—being respected.

As Plaintiffs point out in their brief, "[t]hat funds shall be used for providing counseling and advice to tenants and homeowners, both current and prospective, with respect to property maintenance, financial management or literacy, and such other matters as may be appropriate to assist them in improving their housing conditions, meeting their financial needs, and fulfilling the responsibilities of tenancy or homeownership; for program administration; and for housing

counselor training." Pls.' Mot. at 12, ECF 5-1; Consolidated Appropriations Act of 2024, Pub. L. 118-42, Div. F, title II, 138 Stat. 25, 367 (2024). It would be contrary to congressional mandate for Plaintiffs to use the specifically appropriated funds for activities beyond the statute and its regulations. Thus, using program funds to favor one group over another, or further extraneous activities such as DEI Programs, as opposed to providing counseling is contrary to Congress' purposes for the CHC program. Simply, the misdirection of the CHC funds means that intended beneficiaries are not served as intended.

Lastly, it further bears mentioning that if the Court were to order any relief, it would, of course, not be possible for Defendants to do so on anything close to the time frame Plaintiffs request. *See* Pls.' Prop. Order, ECF 5-2 (requesting an injunction the same day as the proposed order). As Plaintiffs know from their own litigation positions in other cases, issuing NOFOs, maintaining adequate application periods, conducting full merit reviews, obtaining approvals, and complying with congressional notification requirements cannot be accomplished within such abbreviated timelines. It also bears mentioning if the Court orders the relief Plaintiffs appear to seek—the obligation of funds—and Plaintiffs are ultimately unsuccessful by the end of the lawsuit, the Government cannot recover those funds. *Dep't of Educ. v. California*, 604 U.S. at 651–52 ("[R]espondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond.").

* * *

**CONCLUSION**

The Court should deny Plaintiffs' Motion for the reasons above.

Date: October 9, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Sam Escher*
SAM ESCHER, Bar No. 1655538
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(771) 217-8101
sam.w.escher@usdoj.gov

*Attorneys for Defendants*